[No. 31919.  Department Two.  October 2, 1952.]

ROYAL N. RIBLET et al., *Appellants,* v. SPOKANE-PORTLAND CEMENT COMPANY, *Respondent.*[1]

[1]Reported in 248 P. (2d) 380.

*A. O. Colburn* and *Harvey W. Clarke,* for appellants.

*Keith, Winston, MacGillivray & Repsold* and *Witherspoon, Witherspoon & Kelley,* for respondent.

FINLEY, J.—In this action, plaintiffs, Mr. and Mrs. Riblet, seek to recover for damages to their residential property caused by cement dust cast thereupon as a result of the operation of the cement manufacturing plant of defendant, Spokane-Portland Cement Company, a corporation. After both sides had presented their evidence, the trial court (sitting without a jury) granted a motion by the defendant for dismissal on the ground that the evidence was insufficient to support a cause of action, considering the decision in *Powell v. Superior Portland Cement,* 15 Wn. (2d) 14, 129 P. (2d) 536. Plaintiffs have appealed.

Hereinafter, in some detail, we shall discuss the following questions:

1. What is a nuisance?

2. Are the facts in the case at bar and those in the *Powell* case, *supra,* identical or sufficiently similar that the *Powell* decision is controlling (as to whether the evidence in the case at bar supports a cause of action relative to maintenance of a nuisance)?

3. Is the defendant cement company, by its acts or conduct, estopped from asserting a defense based upon the applicable statute of limitations?

4. Is the two-year statute of limitations, Rem. Rev. Stat., § 165, RCW 4.16.130, or the three-year statute of limitations, Rem. Rev. Stat. (Sup.), §§ 159 (1) and 159 (3), RCW 4.16.080 (1) and (3), applicable?

Briefly stated, we think that, on its facts, the *Powell* case must be distinguished, and that it is not controlling in the instant case. Furthermore, we believe that the cement company is not estopped to assert a statute of limitations defense, and that the two-year statute of limitations, Rem. Rev. Stat., § 165, *supra,* is applicable.

Consideration of this appeal requires a rather full outline of the facts and circumstances involved. In 1910, the cement company established a plant at Irvin, Washington, in the Spokane valley, about eleven miles east of Spokane. The distance from any densely populated area and the matter of rail accessibility, among other things, were considered in locating the plant. At the time, there were a few homes in the general locality, but for the most part it was a vacant and unpopulated area. Cement production commenced in 1913, continuing to date in varying, but generally increasing, annual production amounts.

In 1924, Mr. and Mrs. Riblet purchased a tract of about ninety acres, located on top of a rock cliff some three thousand feet northwest across the Spokane river from the cement plant. The Riblets' tract is generally about four or five hundred feet higher in elevation than the cement plant. From the Riblet property there is an impressive view of the valley below. In 1925, the Riblets commenced construction of a home and extensive improvements of the nearby grounds. In the next five years or so they built, among other things, a vista house, a garage, a swimming pool, a croquet court which could be flooded in the winter for use as a skating rink, and an outdoor checker board with giant-sized checkers. Mr. Riblet, who was an official of a tramway construction company and an inventor, also built an aerial tramway from his property to a point across the Spokane river. The Riblets claim that the house and grounds were the culmination of their dreams and that, at the time built, it cost approximately fifty thousand dollars.

Mr. Riblet had worked at Metaline Falls, building tramways for a cement company. He was aware of the dust problems usually accompanying the operation of cement manufacturing plants. It is not clear from the evidence whether his work and experience at Metaline Falls was before or after beginning the construction of the Riblet residence. He testified upon cross-examination that on occasions after purchasing the land, but before starting construction, he had observed smoke and dust coming from the stack at the plant and, from his past experience, knew of a possible dust problem. However, he claimed it was his impression that the production capacity of the plant was only around two hundred barrels a day. When questioned as to the source of this belief, it appeared he had made no inquiry from the plant officials; he stated that this particular knowledge was "public knowledge." The production *capacity* at the time was approximately fifteen hundred barrels a day. Respondent stated that 215,000 barrels was the average annual production between the years 1913 and 1935. Allowing for the possibility that the plant operated only five or six days a week, the actual daily production for the above period, based on the above figures, would average somewhere between 589 and 811 barrels. In any event, Mr. Riblet claimed that, because of the prevailing winds (which should have carried any dust away from his property), and because of the supposedly limited production of cement by the company, initially, and for a long time thereafter, he did not believe the dust problem would be troublesome to any serious extent.

The evidence is conflicting as to when the cement dust first became a serious problem. The company contends that the dust problem was apparent at all times; that the Riblets must have voluntarily purchased the property with knowledge of it, and should not now be heard to complain. The Riblets maintain that there was no acute dust problem until about 1939, or thereafter. Cross-examination of Mr. Riblet relative to photographic exhibit 13, taken about 1935, suggests that there was some dust deposited on his property as early as 1935. It is his contention that a significant in-

crease in the production of cement by the company caused the dust problem.

The precipitation of the dust results in a fine encrustation of cement on building exteriors and the landscape generally. Growth of shrubbery and plants was made difficult, if not impossible, under such conditions. When the encrustation was removed from building exteriors, the paint came off with it. The dust seeped into the interior of the buildings. It made housecleaning difficult and required windows to be kept shut. It settled to the bottom of the swimming pool, and made it too dangerous for use. The original color of tile roofing was transformed into a dull gray. Automobiles, left outside, were soon covered with a fine dust, almost imperceptible, but quite apparent when one ran his finger across the surface.

The Riblets contend that the dust made their home practically useless except as a shelter from the elements. The cement company contends that the Riblets have had full use of their property and will continue to have full use of it; now that an effective dust-control program is in operation.

The Riblets assert that the dust-control program, inaugurated by the company, afforded no relief until 1950, when, for the first time, something was done about the smoke or dust stack.

A letter written on October 16, 1939, by the Riblets is the first record evidence of any protest from them to the company. This letter stated that the dust problem had "now become unbearable and cannot be tolerated." The company replied on October 25, 1939, stating that the matter would be submitted to its board of directors at their next meeting, and this apparently was done. No further action was taken by the Riblets in 1939. Apparently they contemplated a lawsuit in 1941 or 1942, but were advised by an attorney friend that cement production was necessary for the war effort, and that it would be unpatriotic for them to sue the company during the war years. Several years passed. On October 2, 1947, the Riblets sent an invoice for forty thousand dollars for "irreparable damages to my property by uncontrolled cement dust from your plant at Irvin." The company made

no reply. The Riblets renewed their claim for damages by a letter from their attorneys dated January 14, 1949. There was no immediate follow-up until the present suit was instituted on May 22, 1950.

A demurrer by the cement company to the Riblets' amended complaint was overruled, and a motion to make more definite and certain was denied. Judge Kelly, on overruling this demurrer, felt that the *Powell* case was distinguishable from the case at bar. However, at the trial of the law suit on its merits, Judge Edgerton concluded to the contrary, that the *Powell* case was controlling as to the case at bar. He granted the cement company's motion to dismiss on the ground, as pointed out above, that the evidence was insufficient to support a cause of action.

■ Our basic point of inquiry relates to the general theory of the law of nuisance. This appears primarily to be based upon generally accepted ideas of right, equity, and justice. The thought is inherent that not even a fee simple owner has a totality of rights in and with respect to his real property. In so far as the law of nuisance is concerned, rights as to the usage of land are relative. The general legal principle to be inferred from court action in nuisance cases is that one landowner will not be permitted to use his land so unreasonably as to interfere unreasonably with another landowner's use and enjoyment of his land.

The crux of the matter appears to be reasonableness. Admittedly, the term is a flexible one. It has many shades and varieties of meaning. In a nuisance case, the fundamental inquiry always appears to be whether the use of certain land can be considered as reasonable in relation to all the facts and surrounding circumstances.

■ Application of the doctrine of nuisance requires a balancing of rights, interests, and convenience. The rule in the *Powell* case, consequently, is a rule dependent upon the facts and circumstances unique to that case. Whether that decision with regard to an alleged nuisance or decisions in other cases relative to alleged nuisances will be controlling in a given case, is dependent purely and simply upon identity or similarity of facts and circumstances.

It may appear that a definite point of demarcation was reached in the *Powell* case in the development of the law of nuisance in our state. Upon analysis, it seems that such a demarcation, if it be one, relates to or is dependent entirely upon the occurrence of the unique factual situation therein involved. In a number of cases prior to the *Powell* case, expression was given to a feeling or conviction that the industrial use of property conferred no particular immunity upon the user in relation to claimed damages on the part of neighboring land owners. This appears to us to have been dicta, not necessarily attributable to the pertinent factual situations involved. The cases do not seem to have involved extensive or unique industrial usage of land on ·the part of the defendants therein.

With the advent of the *Powell* case, the court was squarely confronted with a factual situation involving extensive and rather unique industrial usage by the defendant of his property. The economy and well-being of the town of Concrete, Washington, was substantially dependent upon and interrelated with the operation of the cement manufacturing plant in that case. The value of plaintiff's property was dependent directly and in very large measure upon the continuation of cement production by the defendant, which action, it was claimed, constituted the nuisance. In the main, the *Powell* facts show that the town of Concrete and the general locality was an industrial area which had been and was devoted substantially to an industrial activity, namely, the manufacture of cement.

In the case at bar, it is quickly apparent that the facts are distinguishable from those in the *Powell* case. The general neighborhood and its population were not substantially devoted to or engaged in industrial activity, that is, the production of cement. There was no industrial or manufacturing town wherein plaintiff's property was located. The property of the Riblets was not clearly benefited in value by the operation of the cement plant; if anything, the contrary seems to be true in the case at bar. In the *Powell* case, the court characterized the damages as an inseparable part of the

manufacturing activity, and apparently was of the view that the cost of a dust-controlling program would be prohibitive under the circumstances involved in that case. In the instant case, substantial sums actually have been expended upon a seemingly highly effective dust-control program, installed for some time and now in operation.

■ We are convinced that the *Powell* case must be distinguished on the basis of its unique facts and circumstances; that it is not controlling as to the case at bar; and that it was error for the trial court to grant the cement company's motion to dismiss.

In support of the contention that acts or conduct of the cement company worked an estoppel, which negates or prevents a defense by the company based upon the applicable statute of limitations, a California decision, *Miles v. Bank of America Nat. Trust & Savings Ass'n,* 17 Cal. App. (2d) 389, 397, 62 P. (2d) 177, is cited. Analysis of the quotation from that case indicates that the party claiming nuisance damages

". . . was repeatedly assured that if he would be patient and wait, the bank would carry out its agreement. He was urged not to 'start anything by going to any attorneys'; to 'lay low and they would do just like they promised.' "

The court further said:

"Acceptance by appellants of the favor so solicited from respondent involved as a matter of fair dealing an implied undertaking on appellants' part not to rely upon a defense based upon facts coming into existence solely from the granting of that favor by the plaintiff and his forbearance from bringing the suit within the statutory period." (pp. 397, 398)

■ Heretofore, we have outlined the facts relative to the conduct of the Riblets and of the cement company which, allegedly, constitute a basis for estoppel in the case at bar. Unquestionably, Mr. Riblet did write to the cement company and the latter replied. However, neither this correspondence nor other acts of the parties amount to an inducement not to sue. Forbearance from suit on the part of the Riblets might possibly be inferred, but it cannot be said

that such was clearly indicated. Failure to institute suit as late as 1941 and 1942 seems to be explained by the advice the Riblets solicited and accepted from an attorney friend, that cement production was important to the war effort, and that it would be unpatriotic to bring suit at that time. Emphasis seems, at the time, to have been upon this advice rather than upon any reliance attributable to acts or conduct of the cement company. The first clear-cut protest from the Riblets occurred in 1947, when an invoice for damages, allegedly resulting from the cement dust, was presented to the company. Even then, no specific legal steps were taken until the advent of the letter dated January 14, 1949, from attorneys representing the Riblets. Finally, suit was instituted on May 22, 1950.

As to any threat of a lawsuit or request for forbearance, Mr. Riblet in his direct testimony stated:

"I visited the plant at their request, and I think I went over once at my own request. But they have been very nice and courteous about that. And I suggested they use some kind of water system, which I believe they tried, but it was on a small scale and didn't prove very successful. And from that standpoint there has been nothing but friendliness all the way through. Nothing that I could say, 'If you don't do that, I am going to sue you.' It hasn't been that kind of a situation."

In *Marshall-Wells Hardware Company v. Title Guaranty & Surety Co.*, 89 Wash. 404, 411, 154 Pac. 801, we said:

"There was evidently no thought in this promise to waive the statute of limitations. It has been held that the statute of limitations will run unless waived by an agreement *expressly or clearly to be implied*." (Italics ours.)

We agree with the trial court that the cement company is not estopped to raise a defense based upon the applicable statute of limitations.

Now as to the question regarding the applicable statute of limitations, we refer to the statement in appellant's brief as follows:

"*It is true that this court has ruled generally that in actions for nuisance the two year statute applies.* A critical

examination of those cases, we believe, will reveal that the nuisances involved the carrying on of offensive trades or businesses which in no wise constituted an actual physical invasion of the complainant's premises." (Italics ours.)

■ A fair analysis of our decided cases indicates the truth and pertinency of appellant Riblet's concession regarding the applicable statute of limitations. His arguments attempting to distinguish the instant case as one wherein the two-year statute of limitations should not apply are ingenious and quite persuasive. However, we are convinced that the two-year statute of limitations is applicable. *Suter v. Wenatchee Water Power Co.*, 35 Wash. 1, 76 Pac. 298; *Weller v. Snoqualmie Falls Lbr. Co.*, 155 Wash. 526, 285 Pac. 446.

■ At the trial, there seems to have been considerable dispute as to the applicable rule of damages. The trial judge held that the damages which could be recovered in this action would be the lessened use-value, if any, of the premises in the two-year period immediately preceding the institution of this action (May 22, 1948, to May 22, 1950). The fifth assignment of error is based upon the trial court sustaining an objection to the following question put to the plaintiff's expert witness:

" 'On that same date, what would be the rental value of the property without any dust at all, either loose dust or encrusted dust?' "

In sustaining this objection, the trial court noted that it had earlier ruled that the two-year statute of limitations governed. If the present question should be permitted, the effect would be to let in evidence concerning damages sustained in a period already barred by the statute of limitations, which evidence would be immaterial to the issues of this case. A case well in point is *Lentz v. Carnegie Brothers & Co.*, 145 Pa. 612, 627, 23 Atl. 219. There, the defendant for some twenty years had cast ashes and refuse into a stream, which refuse was deposited on the plaintiff's land. The plaintiff sued in trespass, and the defendant pleaded the six-year statute of limitations. On trial, the plaintiff was

permitted to show what the land would be worth in its original condition, as it was before the stream pollution began, and its present value—the difference to be the measure of damages. The plaintiff recovered, but the judgment was reversed on appeal. The appellate court stated that one of the reasons why the measure of damages was incorrect was that it let in evidence of damages sustained before the applicable six-year statute of limitations, saying at p. 627:

"The defendants had pleaded the statute of limitations, and the inquiry was thereby limited to six years. The comparison which the testimony placed before the jury carried them back to a time when the stream was not polluted, and the slate and slack had not been deposited on the plaintiff's land. It brought to their notice, not the injury done in six years, but the changes made from the beginning of operations on Brush creek, which was nearly or quite a quarter of a century before the trial. While the learned judge told the jury that the plaintiff could not recover for an injury sustained more than six years before his action was begun, he permitted testimony to be given which brought the entire change in the situation of the plaintiff's flat land to their attention, and which contrasted its value, if in its original condition, with its value in its present condition."

This seems to be the general rule (*Morrow v. Florence Mills,* 181 N. C. 423, 107 S. E. 445; *Cincinnati, N.O. & T.P. R. Co. v. Roddy,* 132 Tenn. 568, 179 S. W. 143), although there is a minority view to the contrary. We think the reasoning of the *Lentz* case, *supra,* should apply herein, and hence, that the trial court did not err in sustaining the objection.

Similarly, the same reasoning applies to the plaintiff's fourth assignment of error. The hypothetical question there is objectionable because it does not, by its wording, clearly limit the damages to the two-year period immediately preceding this suit (assuming in the first place that market value was a proper factor to be considered, a point we do not decide here).

We believe that appellants' significant assignments of error have been adequately covered, and that any further discussion would be unnecessary.

The judgment of the trial court is reversed, and the case is remanded for further proceedings consistent with the views expressed hereinbefore.

SCHWELLENBACH, C. J., HILL, HAMLEY, and OLSON, JJ., concur.

