[No. 25459-6-I.   Division One.   November 13, 1990.]

VICTORIA TOWER PARTNERSHIP, *Appellant,* v. THE CITY OF SEATTLE, ET AL, *Respondents.*

*Richard Hill* and *Michael Vaska,* for appellant.

*J. Richard Aramburu,* for respondent Seattle.

*Thomas A. Goeltz, Lonny E. Townsend,* and *Miriam Reed,* for respondent United South Slope Residents.

*Ray Siderius,* for respondents St. Anne's Parents Club, et al.

FORREST, J.—Victoria Tower Partnership (VTP) appeals from the trial court's partial summary judgment dismissing VTP's appeal from the Seattle City Council's denial of a proposed 16–story apartment building project. We affirm.

VTP owns a 51–unit apartment building at 100 West Highland Drive on Queen Anne Hill in Seattle. The building is three stories tall on the north and four stories tall on the south. The area surrounding the building is mainly a mixture of single family homes and low to mid–rise apartment buildings. The tallest building in the vicinity, a nine–story condominium building, is immediately downhill from VTP's property.

On August 8, 1980, VTP applied for a permit to add a 16–story tower to its building. The tower would consist of 65 units and 11 two–story town houses. Its projected height was 174 feet; the zoning for the property permits a maximum height of 239 feet. On January 28, 1981, Seattle's Department of Construction and Land Use (DCLU) issued a draft environmental impact statement (DEIS), and on June 25, 1982, it issued a final environmental impact statement (FEIS) which incorporated the DEIS.

On October 19, 1982, the DCLU director approved the proposal. Although he found that the tower would be inconsistent with the neighborhood scale, he concluded that this inconsistency could not be a basis for mitigation or denial because the tower conformed to the zoning code and because Seattle's multi–family housing policies, which were inconsistent with the project, had not yet been adopted when VTP filed its permit application. On review, the hearing examiner and the Seattle City Council rejected this reasoning, concluding that the director should have considered the multi–family housing policies and other environmental considerations pursuant to the State Environmental Policy Act Of 1971 (SEPA), RCW 43.21C.

On remand, the DCLU director denied the permit application because the project's incompatibility with the neighborhood scale conflicted with the multi–family housing policies. He also concluded that this adverse effect could not be mitigated because a lower tower would not be economically feasible. The hearing examiner affirmed this decision. The City Council agreed with most of the director's reasoning but concluded that the adverse effects of the project's height could be mitigated by limiting the tower to eight stories. The City Council approved the permit application on this condition. The Superior Court affirmed the Council's decision.

The Court of Appeals reversed, holding that reliance on Seattle's multi–family housing policies violated the vested rights doctrine.[1] The court remanded the matter to the City Council to reconsider its decision without reference to those policies.[2] On remand, the City Council reaffirmed its

---

[1] *Victoria Tower Partnership v. Seattle*, 49 Wn. App. 755, 760–62, 745 P.2d 1328 (1987).

[2] "We remand this case for the City Council to reconsider its decision on the tower's height without using the multi–family policies. In so doing, we realize that the City Council's decision to limit the tower to eight stories might have been based not only on the multi–family policies, but also on other SEPA policies relating to height. However, the Council's explanation of the basis for its decision is ambiguous. The Council did not specifically identify in its written decision the

decision by relying upon a document entitled "Seattle's Growth Policies." This document was adopted by the Council in a resolution on May 23, 1977. Growth Policy 1 directs new residential units to areas where their addition will not threaten "the existing character of neighborhoods." The City Council concluded that this policy alone justified limiting the height of VTP's project.

VTP again sought review in the superior court, challenging the legality of the City Council's decision under SEPA, asserting claims for damages due to regulatory taking and violation of substantive due process, and seeking injunctive relief. Pursuant to an agreed order, the trial court bifurcated the SEPA claims from the damage claims. The court heard the SEPA claims first and dismissed them. It found no just reason for delay and entered final judgment on those claims. VTP appeals the trial court decision.

### AUTHORITY GRANTED UNDER SEPA

This appeal presents one primary issue: did the City Council erroneously use the Growth Policies to override the more specific height provisions of the zoning code when Growth Policy 1 was not specifically identified as relevant in the environmental impact statements?

■■ The "clearly erroneous" standard of review is appropriate for substantive decisions based on SEPA.[3] Under this standard, the court does not substitute its judgment for that of the administrative body and may find the decision "clearly erroneous" only when it is left with the definite and firm conviction that a mistake has been committed.[4] The court is to examine the entire record and all

---

policies it relied on, choosing instead to vaguely refer to a discussion of a handful of these policies in the FEIS, including the multi-family policies. . . . We remand for the Council to clear up this ambiguity." *Victoria Tower*, at 762.

[3]*Cougar Mt. Assocs. v. King Cy.*, 111 Wn.2d 742, 749, 765 P.2d 264 (1988).

[4]*Cougar Mountain*, at 747; *Polygon Corp. v. Seattle*, 90 Wn.2d 59, 69, 578 P.2d 1309 (1978).

the evidence to determine whether the decision appealed should be affirmed.[5] Here, VTP contends that the City Council erred in relying on Growth Policy 1. This actually presents two separate issues: the legal issue of whether the City Council had authority to consider the growth policy in evaluating projects permitted by the zoning ordinance and, secondly, whether the City Council's application of the policy to this project was clearly erroneous. Whether an administrative or local legislative body has authority to consider a statute or a policy is a question of law.[6] We first consider the legal question posed and, in a subsequent section, we examine whether application of Growth Policy 1 was clearly erroneous.

There is no longer any question that SEPA policies can restrict projects otherwise permitted under zoning regulations.[7] SEPA provides that any governmental action may be conditioned or denied based on adverse environmental impacts disclosed in an EIS. Such decisions must be based on:

> policies identified by the appropriate governmental authority and incorporated into regulations, plans, or codes which are formally designated by the agency (or appropriate legislative body, in the case of local government) as possible bases for the exercise of authority . . ..

RCW 43.21C.060.

---

[5]*Polygon*, at 69.

[6]*Lobdell v. Sugar 'N Spice, Inc.*, 33 Wn. App. 881, 887, 658 P.2d 1267, *review denied*, 99 Wn.2d 1016 (1983); *Keyes v. Bollinger*, 31 Wn. App. 286, 289, 640 P.2d 1077 (1982). We note that under the administrative procedure act, which is inapplicable to local agency action, the court would review an agency's allegedly improper reliance on a statute or regulation under the error of law standard. *See* RCW 34.05.570(3)(d).

[7]*Cougar Mountain*, at 752; *Department of Natural Resources v. Thurston Cy.*, 92 Wn.2d 656, 665, 601 P.2d 494 (1979), *appeal dismissed*, 449 U.S. 802, *cert. denied*, 449 U.S. 830 (1980); *Polygon*, at 66; *West Main Assocs. v. Bellevue*, 49 Wn. App. 513, 525, 742 P.2d 1266 (1987), *review denied*, 112 Wn.2d 1009 (1989); *Cook v. Clallam Cy.*, 27 Wn. App. 410, 415, 618 P.2d 1030 (1980), *review denied*, 96 Wn.2d 1008 (1981).

VTP correctly notes that the Growth Policies, when adopted, were to become part of a comprehensive plan.[8] Citing *Cougar Mt. Assocs. v. King Cy., supra,* it argues that the City Council improperly relied upon the Growth Policies, likening them to a comprehensive plan and arguing that the King County Zoning Code, which would permit construction of VTP's 16–story project, overrides the King County Comprehensive Plan and, hence, the Growth Policies.

VTP's reliance on *Cougar Mountain* is misplaced. In *Cougar Mountain,* the court recited the rule that zoning ordinances control conflicting provisions of a comprehensive plan.[9] It immediately held, however, that the subdivision application "complied with the relevant zoning requirements and should not have been denied on the basis of *density guides* in the Comprehensive Plan." *Cougar Mountain,* at 757. (Italics ours.)[10] Hence, the zoning ordinance prevailed over only a portion of the comprehensive plan. The court also held, however, that SEPA policies permit mitigation or denial of a project which complies with the zoning code. Having decided that the King County

---

[8]Seattle City Council Resolution 25533, dated May 23, 1977, adopted the Growth Policies and stated in part:

> WHEREAS, on June 30, 1975, the City Council adopted, and the Mayor concurred with, Resolution 24975 which reaffirmed the intent of the City Council and the Mayor *to proceed with the development of a Comprehensive Policy Plan* for the City, including a statement of the City's "growth policies;"
> . . ..

(Italics ours.)

We note, however, that the italicized language suggests the City had not yet adopted a comprehensive plan. Plainly, then, the Growth Policies were not part of such a plan when this resolution was adopted. VTP has provided no evidence in the record that the Growth Policies were ever made part of Seattle's completed comprehensive plan.

[9]*Cougar Mountain,* at 757 (quoting *Nagatani Bros., Inc. v. Skagit Cy. Bd. of Comm'rs,* 108 Wn.2d 477, 480, 739 P.2d 696 (1987)).

[10]*See also Wildner v. Winslow,* 35 Wn. App. 77, 79, 664 P.2d 1316 (1983), where the court held that a specific density regulation set forth in a zoning ordinance controls over the generalized policy statements in a comprehensive plan.

Council's denial of the project was not sufficiently specific to meet statutory requirements, the court directed the Council to further evaluate the proposal for compliance with SEPA.[11] Unlike the County Council in *Cougar Mountain,* the City Council *did* specify the policies upon which it relied to deny VTP's project, did offer mitigation, and did identify the specific adverse impacts. *Cougar Mountain* does not modify the rule that SEPA "overlays local ordinances and must be enforced even where a particular use is allowed by local law or policy." *Cook v. Clallam Cy.,* 27 Wn. App. 410, 415, 618 P.2d 1030 (1980), *review denied,* 96 Wn.2d 1008 (1981). The remaining authorities relied upon by VTP do not hold that SEPA cannot be applied to deny projects otherwise permitted by zoning regulations.[12]

■■ VTP implicitly suggests that the Growth Policies lost their separate identity if and when they were made part of Seattle's comprehensive plan. This claim, however, is unpersuasive. Indeed, a contrary decision would frustrate application of SEPA. Once adopted, the Growth Policies provided a basis on which to exercise SEPA authority. SEPA bestows broad powers and is to be given a vigorous construction.[13] The policies and goals of SEPA supplement the existing authority of all government agencies and give officials the discretion to deny projects based on negative

---

[11]*Cougar Mountain,* at 757–58.

[12]*See Barrie v. Kitsap Cy.,* 93 Wn.2d 843, 850, 613 P.2d 1148 (1980) (comprehensive plans are advisory and zoning regulations need not accord with such plans; SEPA discussed separately); *Carlson v. Beaux Arts Village,* 41 Wn. App. 402, 408, 704 P.2d 663 (general provisions of comprehensive plan could not be used to deny subdivision permitted by specific zoning regulations; no discussion of SEPA), *review denied,* 104 Wn.2d 1020 (1985); *Wildner v. Winslow,* 35 Wn. App. 77, 79, 664 P.2d 1316 (1983) (specific density regulation set forth in a zoning ordinance controlled over the general policy statements in a comprehensive plan; no discussion of SEPA).

[13]*Cougar Mountain,* at 751; *Leschi Imp. Coun. v. State Hwy. Comm'n,* 84 Wn.2d 271, 280, 525 P.2d 774 (1974); *Eastlake Comm'ty Coun. v. Roanoke Assocs., Inc.,* 82 Wn.2d 475, 490, 513 P.2d 36, 76 A.L.R.3d 360 (1973).

environmental impacts disclosed by an EIS.[14] The Growth Policies are a distinct part of Seattle's comprehensive plan, which is a general statement of purpose or policy providing a broad guide for development.[15]

As the court explained in *West Main,* at 525:

[T]he SEPA standards or policies are not "elevated" above specific zoning ordinances, but rather they provide general guidance for determining whether the environmental impacts of an otherwise acceptable project require the denial of, or the imposition of conditions on, the project. In this regard, our courts have repeatedly stated that SEPA is not a substitute for local zoning ordinances, but "overlays local ordinances and must be enforced even where a particular use is allowed by local law or policy." *Cook v. Clallam Cy.,* 27 Wn. App. 410, 415, 618 P.2d 1030 (1980), *review denied,* 96 Wn.2d 1008 (1981); *West Main Assocs. v. Bellevue,* 106 Wn.2d 47, 53, 720 P.2d 782 (1986); *Polygon,* at 65; RCW 43.21C.060.

The Growth Policies were available to the City Council as an independent basis on which to exercise SEPA authority. Their inclusion in a comprehensive plan did not preclude their use under SEPA. We hold that as a matter of law the City Council had authority to use Growth Policy 1 to evaluate this project.

The case of *Polygon Corp. v. Seattle, supra,* is quite similar to the instant case. In *Polygon,* the Superintendent of Buildings for Seattle denied Polygon's application for a permit to build a 13–story condominium on Queen Anne Hill. The City Council found the project inconsistent with SEPA policies; the most significant adverse impact was found to be visual. The trial court affirmed. The appellant urged that SEPA serves only an informational function through its requirement that an EIS be prepared and does not confer substantive authority to act with reference to the environmental impacts disclosed. The court rejected this argument, holding that the City Council had the discretion under SEPA to deny a building permit based on adverse

---

[14]*Polygon,* at 65; *West Main,* at 527 (quoting R. Settle, *Washington Land Use and Environmental Law* § 5.3(a), at 170–71 (1983)).

[15]*See Cougar Mountain,* at 756; *West Main,* at 525; RCW 36.70.020(6).

environmental effects revealed by an EIS although, as in this case, the permit met zoning requirements. The court refused the appellant's suggested reading of SEPA, which "would thwart the policies it establishes and would render the provision that 'environmental amenities and values will be given appropriate consideration in decision making' a nullity. RCW 43.21C.030(2)(b)." *Polygon*, at 63.

### EIS REQUIREMENTS

VTP also contends that the City Council's reliance on Growth Policy 1 was improper since it was not identified in the EIS. The primary function of an EIS is to identify adverse impacts to enable the decisionmaker to ascertain whether they require either mitigation or denial of the proposal. Former WAC 197–10–440(6)(f), in effect when the DEIS and FEIS were prepared, required a "brief description of existing comprehensive land use plans and zoning regulations applicable to the proposal[.]" The DEIS and FEIS satisfied this requirement. The material portion of Growth Policy 1 reads:

> **Policy 1: City Population:** Seattle shall strive for a population level of 500,000 to 550,000 persons by 1990 by:
>
> . . . .
> d. Offsetting potential population losses due to outmigration of families and low birthrates by increasing the number of households through constructing a variety of 1200 to 1800 new housing units per year *in areas where their addition will not threaten the existing character of neighborhoods*[.]

(Italics ours.)

Although it did not specifically refer to Growth Policy 1, the FEIS referred to Seattle's Growth Policies. It recognized that the "scale of the project is inconsistent with and destructive to its neighborhood surroundings" because of adverse impacts on aesthetics, light, traffic, density and open space.[16] Hence, VTP was clearly alerted by the EIS that its project would "threaten the existing character of

---

[16]FEIS, at 398.

neighborhoods" contrary to Growth Policy 1. We are satisfied that the DEIS and FEIS properly identified the policies invoked to establish the adverse impacts of the project.

### CONSISTENCY WITH GROWTH POLICY 1

VTP also urges that its project was consistent with Growth Policy 1 because this was not a single family neighborhood, and, accordingly, any mitigation or denial was improper. Although VTP correctly notes the presence of some multi–family and tall structures on nearby sites, it fails to mention that much of the neighborhood consists of single family homes, as well as a park and a church with a school and playground.[17] The information provided in the DEIS and FEIS entitled the City Council to conclude that the proposed site was within a primarily single family neighborhood. VTP implies that Growth Policy 1 would have no application if the neighborhood was instead primarily multi–family. The relevant language of Growth Policy 1, however, is not limited to single family neighborhoods. A project of the scale proposed by VTP could also threaten the existing character of a multi–family neighborhood consisting primarily of low–rise buildings. The EIS materials, specifically the photographs with the tower portion superimposed, fully support the determination that the project would threaten the existing character of the neighborhood. This is essentially a factual determination to which we apply the clearly erroneous standard. We find the record substantiates the City Council's decision.

Rather than flatly deny the application, the City Council as a mitigation measure allowed the same density with an eight–story height limitation. VTP interprets this action to mean that all other adverse impacts except height had been removed. This is clearly not the case. While height alone

---

[17]DEIS, at 78–80; FEIS, at 378.

might very possibly have justified denial,[18] other adverse impacts caused by the project also remained. As previously noted, the FEIS identified adverse impacts on aesthetics, light, traffic, density, and open space.

■ SEPA encourages compromise and accommodation by requiring that the decisionmaker consider mitigation and state why it is inadequate to relieve the adverse impact.[19] When the decisionmaker imposes some mitigation measures, this does not necessarily mean that unmitigated impacts no longer exist or will be totally eradicated by mitigation, but merely that as mitigated, the project as a whole is acceptable. Hence, a local official and subsequent reviewing court consider all the identified adverse impacts.

■ VTP also argues that the City Council erred by relying on purely aesthetic considerations in denying the project. Its contention is unpersuasive. RCW 43.21C-.020(2)(b) specifies among the purposes of SEPA to assure "for all people of Washington safe, healthful, productive, and *esthetically* and culturally pleasing surroundings". (Italics ours.) An EIS must also note such environmental impacts as "physical blight" and the design of a proposed project.[20] The City Council was entitled to consider the aesthetic impact of the project along with other adverse impacts identified in the FEIS in requiring mitigation. The required mitigation was not clearly erroneous.

## DUE PROCESS

■ VTP contends that it has been denied its property rights without due process of law by reason of the City Council's allegedly unpredictable application of SEPA

---

[18]*See Polygon Corp. v. Seattle,* 90 Wn.2d 59, 578 P.2d 1309 (1978) (*court affirmed Seattle's denial under SEPA of a building permit due to the adverse visual impact caused by the excessive scale and bulk of the project*).

[19]RCW 43.21C.060.

[20]WAC 197–11–440(6)(d), (e).

policies. On the contrary, the City's opposition to this project has never changed. Every official reviewing the project found it was out of scale with the neighborhood.[21] Not surprisingly, VTP cites no authority for its argument that the City Council's decision not to downzone the project area in 1976 estops a municipality from subsequently adopting policies that may limit development that the zoning code would permit. Such is not the law.

■ Exercise by local government of its police power to protect the public health, safety and general welfare must be reasonable and rationally related to a legitimate purpose of government.[22] When mitigating a project, the City Council must identify and rely upon policies in effect prior to submission of the building permit application in order to satisfy due process requirements.[23] The City Council adopted Seattle's Growth Policies in 1977. It properly evaluated the project's conformity to Growth Policy 1, which was identified in the Council's decision dated July 5, 1988.

■ VTP finally asserts that the generality of such policies results in unbridled discretion to deny politically unpopular projects. We disagree. The policies mandated by SEPA cannot by their very nature be as specific as zoning or building codes. Municipalities are necessarily vested with considerable discretion in implementing SEPA policies. The purpose of applying the clearly erroneous standard rather than the arbitrary and capricious standard is to

---

[21]When the project was first submitted, the DCLU director identified the adverse impacts of height, bulk, shadow, scale, increased traffic and parking demand, and view blockage, although he approved the project since he erroneously believed he had no legal power to mitigate these impacts.

[22]*West Main Assocs. v. Bellevue*, 106 Wn.2d 47, 52, 720 P.2d 782 (1986); *Norco Constr., Inc. v. King Cy.*, 97 Wn.2d 680, 649 P.2d 103 (1982).

[23]*Victoria Tower Partnership v. Seattle*, 49 Wn. App. 755, 745 P.2d 1328 (1987).

insure the fair and equal application of SEPA policies and to prevent the municipality's abuse of its discretion.[24]

VTP presents its case as one of a landowner's right to build being frustrated by a politically motivated city bureaucracy and council. What it fails to recognize is that this case presents a conflict between the property rights of VTP as owner and developer and the property rights of St. Anne's and the other property owners represented by the United South Slope Residents. The City Council's responsibility is to strike a proper balance between these conflicting rights in light of SEPA policies. In substance, although not in form, this is analogous to the traditional common law nuisance case where the court must balance the rights of landowners where the activity on one owner's property has adverse effects on the neighbor's property.[25] SEPA mandates that local government identify and evaluate the adverse effects of one owner's project on his neighbor's property and the community. VTP's pejorative characterization as "political" the Council's consideration of nearby landowners' concerns about the impact of projects on their property is unpersuasive. Inviting comment from such landowners is a proper and inevitable part of the process in approving or denying a building proposal.

As a matter of law, the City Council had the right to evaluate this project in light of Growth Policy 1, its decision that it was inconsistent with this policy and required substantial mitigation was not clearly erroneous, and was consistent with due process.

Affirmed.

GROSSE, A.C.J., and PEKELIS, J., concur.

Review denied at 116 Wn.2d 1012 (1991).

---

[24]*Cougar Mountain, supra; Polygon, supra.*

[25]*See McInnes v. Kennell,* 47 Wn.2d 29, 286 P.2d 713 (1955); *Riblet v. Spokane–Portland Cement Co.,* 41 Wn.2d 249, 254, 248 P.2d 380 (1952).