[Nos. 14936-2-II; 15753-5-II.   Division Two.   June 30, 1993.]

VIRGIL L. ADAMS, ET AL, *Respondents,* v. THURSTON COUNTY, *Appellant.*

LYLE ANDERSON, ET AL, *Respondents,* v. THURSTON COUNTY, *Appellant.*

*Patrick D. Sutherland, Prosecuting Attorney,* and *Thomas R. Bjorgen, Deputy,* for appellant.

*Ernest L. Meyer* and *Meyer Law Office; Larry J. Smith* and *Graham & Dunn,* for respondents.

*George Richard Hill* and *Roger A. Pearce,* amici curiae.

SEINFELD, J. — Thurston County appeals two separate summary judgments in favor of two property owners. In each

case, the trial court held that development rights vested on the date the property owners filed their preliminary plat applications. The County, relying on Thurston County Code (TCC) 18.12.030, contends that the date of vesting should be the date the final environmental impact statement is filed. It further urges that its ordinance does not conflict with state statutes and is constitutional. We consolidated the appeals and affirm.

## ADAMS

Virgil Adams[1] owned property he intended to develop into two subdivisions in Thurston County: McAllister Park and Lacey Estates. On June 22, 1987, Adams filed with the Thurston County Planning Department a preliminary plat application for a residential development of 600 lots called McAllister Park. On November 30, 1987, Adams's predecessors filed a preliminary plat application for Lacey Estates; they have assigned their interest and rights in the application to Adams.

The planning department issued a determination of significance requiring preparation of an environmental impact statement (EIS) for McAllister Park. Adams has not yet submitted the EIS. At the applicants' request, the County has not yet issued its threshold determination of environmental significance or nonsignificance for Lacey Estates.

In September 1988, the Thurston County Board of Health[2] adopted a resolution creating a geologically sensitive area in the vicinity of the McAllister Springs aquifer and imposing a 2-year suspension of building site approvals within the area. Both of Adams's proposed plats were within the area. By August of 1990, the board of health had determined that Adams's property did not lie over the sensitive aquifer.

---

[1] The named plaintiffs in this case are Virgil L. Adams and Katherine A. Adams, husband and wife, and Dennis Adams. Virgil Adams died during the pendency of this appeal. We will refer to the remaining plaintiffs as "Adams".

[2] Composed of the county commissioners.

In July 1990 the board of county commissioners rezoned the area in which the Adams property is situated, changing the density requirements from two to four dwelling units per acre to one dwelling unit per 5 acres. The rezone was pursuant to the Thurston County Comprehensive Plan and the Urban Growth Management Agreement.[3]

Adams brought a declaratory judgment action, seeking a ruling that his development rights were vested in 1987 when he filed his preliminary plat application and that the zoning standards in effect on that date controlled the density of McAllister Park and Lacey Estates. The trial court granted summary judgment to Adams. Thurston County appeals.

## ANDERSON

Lyle Anderson[4] filed an application for preliminary plat approval of a proposed subdivision to be known as Silver Hawk Country Club Estates (Silver Hawk) on April 5, 1990. The rezone of July 31, 1990, limiting development to one unit per 5 acres, included the Silver Hawk property. Anderson also sought a declaratory judgment that his development rights vested on the date of his application. Anderson and Thurston County agreed that, pending appeal, the Adams decision governed Anderson's action. The parties entered into a stipulated summary judgment, ordering that Anderson's development rights vested on April 5, 1990. Thurston County appeals.

## STANDARD OF REVIEW

■ We review the order of summary judgment de novo, performing the same inquiry as the trial court. *Simpson Tacoma Kraft Co. v. Department of Ecology*, 119 Wn.2d 640, 646, 835 P.2d 1030 (1992). We affirm a summary judgment if the parties have failed to present to the trial court evidence

---

[3]Thurston County and the Cities of Olympia, Lacey, and Tumwater entered into the agreement on June 20, 1988.

[4]Lyle Anderson is one of several named plaintiffs; we will refer to the plaintiffs in this appeal as "Anderson".

of a genuine issue of material fact and, further, if the moving party is entitled to judgment as a matter of law. CR 56(c).

## VESTING AND SEPA

█ In 1987, the Legislature codified the previous common law vesting doctrine and extended it to plat applications. Laws of 1987, ch. 104, pp. 317-18.[5] Under Washington law, property development rights vest at the time a developer files a complete and legally sufficient building permit or preliminary plat application. RCW 19.27.095(1); RCW 58.17.033(1); *see Valley View Indus. Park v. Redmond*, 107 Wn.2d 621, 638, 733 P.2d 182 (1987). The date on which development rights vest determines which land use laws, rules, and policies will apply to that development. The development is controlled by the law in effect at the time of vesting, not laws enacted later. *West Main Assocs. v. Bellevue*, 106 Wn.2d 47, 50-51, 720 P.2d 782 (1986) (*West Main* I); *Victoria Tower Partnership v. Seattle*, 49 Wn. App. 755, 761-62, 745 P.2d 1328 (1987) (*Victoria Tower* I). The purpose of the rule is to allow developers to fix the rules that will govern their land development. *West Main* I, 106 Wn.2d at 51.

The State Environmental Policy Act of 1971 (SEPA) directs local governmental authorities to develop local SEPA policies and to adopt rules, consistent with state rules, integrating SEPA into "the various programs under their jurisdiction for implementation." RCW 43.21C.120(3), .060; *Victoria Tower* I, 49 Wn. App. at 758. SEPA overlays and supplements all other state laws, RCW 43.21C.030, .060; *Victoria Tower Partnership v. Seattle*, 59 Wn. App. 592, 599, 800 P.2d 380 (1990) (*Victoria Tower* II), *review denied*, 116 Wn.2d 1012 (1991), and "*mandates* governmental bodies to consider the total environmental and ecological factors to the fullest in deciding major matters." *Eastlake Comm'ty Coun. v. Roanoke Assocs., Inc.*, 82 Wn.2d 475, 490, 513 P.2d 36, 76 A.L.R.3d 360 (1973).

---

[5]House Comm. on Local Government, *Report on SSB 5519* (Mar. 26, 1987); Senate Comm. on Governmental Operations, *Report on SSB 5519* (Mar. 16, 1987).

476

Before a local government takes any major action with a probable significant and adverse environmental impact (*e.g.*, approval of a building permit or plat application), it must prepare an EIS. RCW 43.21C.030(2)(c), .031. An EIS must analyze a proposal in light of its significant adverse impacts and consistency with local environmental policies and discuss alternatives to the proposal, mitigation measures, and unavoidable impacts. RCW 43.21C.030(2)(c), (d), .031; WAC 197-11-440; *Victoria Tower* I, 49 Wn. App. at 758.

A local government may condition or deny a proposal based on adverse environmental impacts which make the action inconsistent with previously adopted local SEPA policies, even if the project complies with local zoning and building codes. RCW 43.21C.060; *Polygon Corp. v. Seattle*, 90 Wn.2d 59, 64-66, 578 P.2d 1309 (1978); *Victoria Tower* II, 59 Wn. App. at 597; *West Main* I, 106 Wn.2d at 53; *West Main Assocs. v. Bellevue*, 49 Wn. App. 513, 525-26, 742 P.2d 1266 (1987) (*West Main* II), *review denied*, 112 Wn.2d 1009 (1989). However, under vesting law local government "cannot frustrate the development by enacting new zoning regulations" once a development is vested. *West Main* I, 106 Wn.2d at 51.

Procedurally, when presented with a proposal (application), the County must make a threshold determination of environmental significance or nonsignificance, usually based on an environmental checklist prepared by the applicant. WAC 197-11-100, -315, -330. If it issues a determination of significance, the County must determine the scope of the required EIS. RCW 43.21C.031; WAC 197-11-360, -408, -410. It does so by consulting with a variety of interested persons and organizations. RCW 43.21C.031; WAC 197-11-408(2)(a).

Although the local government or agency "may have an EIS prepared by agency staff, an applicant or its agent, or by an outside consultant", the local government, here Thurston County, remains responsible for the EIS. WAC 197-11-420(2), (1), -100(3), -050. Following circulation of a draft EIS to federal and state agencies, other political subdivisions, tribes,

and the public for comment, WAC 197-11-455, -502(5), the County may conduct a public hearing on the proposed action's environmental impacts. WAC 197-11-502(6), -535. It then prepares and issues a final EIS, WAC 197-11-460, -560, in which it responds to the comments to the draft EIS. WAC 197-11-560. As Adams noted in a deposition, preparation of an EIS can be a time-consuming and expensive process.

CONFLICT WITH STATE STATUTES

RCW 58.17.033(1) declares that a proposed subdivision of land "shall be considered under the . . . zoning or other land use control ordinances, in effect . . . at the time a fully completed application for preliminary plat approval . . . has been *submitted* to the appropriate county. . . official." (Italics ours.)[6] The statute also grants local government the authority to define the requirements for a fully completed application. RCW 58.17.033(2).

At the time of the plat application, Thurston County had not adopted an ordinance defining a "fully completed application". However, two then-effective Thurston County ordinances outlined requirements for preliminary plat applications. We look to these ordinances to determine local requirements for a fully completed plat application. *See Friends of the Law v. King Cy.*, 63 Wn. App. 650, 655, 821 P.2d 539 (1991), *review denied*, 119 Wn.2d 1006 (1992).[7] TCC 18.12.020 states that "[i]nformation

---

[6]RCW 58.17.033 provides:

"(1) A proposed division of land, as defined in RCW 58.17.020, shall be considered under the subdivision or short subdivision ordinance, and zoning or other land use control ordinances, in effect on the land at the time a fully completed application for preliminary plat approval of the subdivision, or short plat approval of the short subdivision, has been submitted to the appropriate county, city, or town official.

"(2) The requirements for a fully completed application shall be defined by local ordinance.

"(3) The limitations imposed by this section shall not restrict conditions imposed under chapter 43.21C RCW [SEPA]."

[7]In *Friends of the Law,* an ordinance setting forth the procedures for filing required the plat be accompanied by drainage plans, but provided for filing the

required on preliminary plat applications is specified in . . . 18.12.140". TCC 18.12.140 states that "[t]he preliminary plat shall show specifically and clearly all of the following features and information" and then lists many specific requirements. Neither TCC 18.12.020 nor .140 requires an environmental impact statement. Both Adams[8] and Anderson met the requirements of TCC 18.12.140.

Nonetheless, the County, looking to TCC 18.12.030, contends that while the developers may have filed complete applications, they have not yet officially *submitted* those applications. TCC 18.12.030 provides, in part:

> If it is determined that an environmental impact statement is required to be completed, then the plat shall not be considered as *submitted* until the final environmental impact statement has been completed.

(Italics ours.) Thurston County interprets its ordinance[9] as delaying vesting until completion of a final EIS, when one is required. According to the County's interpretation, a preliminary plat is "submitted" when it is filed with the planner. Development rights vest at that time. However, if the County later determines that an environmental impact statement is necessary, the submission is functionally canceled and devel-

---

plans a short time after submittal of the plat application. 63 Wn. App. at 652-53, 655-56. Thus, the drainage plans were not "a requirement for a complete application at the *preliminary* plat stage." (Italics ours.) 63 Wn. App. at 656. In addition, the longstanding practice had been to require the drainage plans only at the time of *final* plat approval. 63 Wn. App. at 653, 656.

[8]The planning department initially told Adams that his applications were complete and vested, indicating a previous policy of not requiring an impact statement as part of a preliminary application.

[9]TCC 18.12.030 provides:
"Each and every preliminary plat submitted to the planner shall be accompanied by an environmental assessment statement. If it is determined that an environmental impact statement is required to be completed, then the plat shall not be considered as submitted until the final environmental impact statement has been completed. No public hearing on the preliminary plat shall be held until the final environment[al] impact statement (if required) has been completed and been made available for the general public."

opment rights do not vest until such time as the County fulfills its responsibility to complete an EIS.

■ We must decide if the County's interpretation of TCC 18.12.030 impermissibly conflicts with RCW 58.17.033. An ordinance which violates or conflicts with general statutes is invalid, *Employco Personnel Servs., Inc. v. Seattle*, 117 Wn.2d 606, 617, 817 P.2d 1373 (1991), and unconstitutional. Const. art. 11, § 11; *State v. Truong*, 117 Wn.2d 63, 67, 811 P.2d 938 (1991). An ordinance conflicts with state law if it permits or licenses what the statute forbids or declares right what the statute declares wrong, or vice versa. *Republic v. Brown*, 97 Wn.2d 915, 919, 652 P.2d 955 (1982). The two provisions must be contradictory in the sense that they cannot coexist. *Brown*, 97 Wn.2d at 919.

■ The County's interpretation of TCC 18.12.030 would interpose, in some cases, the entire SEPA process between filing of the application and vesting. RCW 58.17.033 requires vesting, in all cases, when the application is filed. The two provisions impermissibly conflict. Further, RCW 58.17.033 does not permit Thurston County to define, through TCC 18.12.030, a fully completed application as including a final EIS.

■ The subdivision code, RCW 58.17, contains a definition of a preliminary plat. RCW 58.17.020(4). It provides that the preliminary plat, "a neat and approximate drawing of a proposed subdivision . . . shall be the basis for the approval or disapproval of the general layout of a subdivision." It is clear that the Legislature in granting authority to local government to define the requirements for a completed application did not intend for local government to add contingent requirements, not determinable at the time the application is filed and not within the control of the proponent of the project. The inclusion of an EIS as a contingent requirement for a fully completed plat application would violate the intent of RCW 58.17.033 and frustrate the purpose of the vesting rule. Since the County has the responsibility to review the plat application, issue a determination of significance, establish the scope of the EIS, prepare

and circulate a draft EIS, and then complete a final EIS, it is in a position to manipulate the date the EIS is completed. This interpretation would cause project proponents to lose the ability to fix the rules that govern their land development, contrary to the purpose of the vesting rule.[10] *West Main* I, 106 Wn.2d at 51.

In *West Main* I, the City of Bellevue interposed eight review and permit steps between the initial request for a building permit and the official filing of the permit application. 106 Wn.2d at 49. By delaying official filing and thus delaying the vesting point until well after initial application, the City reserved to itself "almost unfettered ability to change its ordinances in response to a developer's proposals." 106 Wn.2d at 53. Citizens were thus exposed to delay and fluctuating legislative policy, violating the vesting doctrine. 106 Wn.2d at 51, 53. The *West Main* I court concluded that "Bellevue has misused its power [to monitor land use] by denying developers the ability to determine the ordinances that will control their land use." 106 Wn.2d at 53. Here, the County's delayed vesting rule likewise exposes citizens to delay and fluctuating legislative policy and denies them the ability to determine the controlling ordinances.

Thurston County's interpretation of its ordinance also conflicts with SEPA statutes and rules. First, it turns the SEPA process on its head. Under the ordinance, the County prepares a final EIS for a proposal that has not yet been officially submitted. Under SEPA, the County prepares an EIS only when a "major action" is pending; before submittal there is no action pending and nothing to review. RCW 43.21C.030(2)(c); WAC 197-11-055(2)(a), -406.

Second, SEPA rules require that environmental review begin when a proposal's environmental impacts can be rea-

---

[10]Thurston County argues extensively in its brief against the "pernicious effect of an unyielding rule that rights vest upon application", contending that "substantial and permanent injury may be done to the public interest by those racing to apply for a permit to avoid a pending zoning change". This argument is more appropriately addressed to the Legislature. We must decide this matter based on state law and its interpretation by the court and not on our personal notions of wise land use policy.

sonably identified and meaningfully evaluated. WAC 197-11-055(2), (2)(a). To determine those impacts, it is necessary to be able to determine the applicable zoning and related land use regulations. If a developer's rights were not to vest until completion of an EIS, environmental impacts could continue to fluctuate along with changes in land use regulations. This clearly would complicate the task of performing a final analysis of the project's environmental impacts. For these reasons, it appears logically absurd to require the final EIS as a component of a preliminary plat application. Further, as discussed above, the County's own ordinances defining preliminary plat applications do not require submittal of a final EIS as part of such applications.

Under the County's interpretation, TCC 18.12.030 forbids vesting until the filing of an EIS while RCW 58.17.033 provides for vesting when the application is filed. TCC 18.12-.030 similarly conflicts with SEPA.

Finally, the County argues that TCC 18.12.030, by delaying "submittal" until completion of a final EIS, simply ensures that the County not evaluate proposed plats until it has full environmental information. We are not persuaded. The ordinance adds nothing to the review process and, as the County interprets it, simply delays vesting. Under SEPA, with or without the ordinance, Thurston County must gather complete environmental information. RCW 43.21C.030(2)(c), .031. It can use the impacts identified in the EIS to condition or deny the project, even if the project is allowed under zoning and building ordinances frozen at the time of vesting. RCW 43.21C.060; *e.g., West Main* I, 106 Wn.2d at 53; *Victoria Tower* II, 59 Wn. App. at 597; *West Main* II, 49 Wn. App. at 526. Vesting of development rights at the time of application or submittal does not defeat the County's discretionary ability to condition or deny any plat based on environmental impacts.[11]

---

[11]The County must base any condition or denial on SEPA policies adopted prior to the application or submittal date, because vesting applies to those policies as well. *Victoria Tower* I, 49 Wn. App. at 761-62.

The only real purpose served by the County's interpretation of the ordinance is to allow it to change its zoning laws to defeat or modify a particular subdivision by delaying vesting until after environmental review. The County argues that later vesting is a preferable policy. The Washington Legislature and Supreme Court disagree.

CONCLUSION

We hold that Thurston County's interpretation of TCC 18.12.030 as delaying vesting until completion of a final EIS conflicts with and is preempted by state statutes and, therefore, is invalid. Because we decide this case on preemption grounds, we need not discuss the alternative constitutional issues extensively briefed by the parties and amici.

Affirmed.

ALEXANDER, C.J., and MORGAN, J., concur.