[No. 27350-1-II.   Division Two.   January 17, 2003.]

FLOATING HOMES ASSOCIATION, *Appellant*, v. THE DEPARTMENT OF FISH AND WILDLIFE, ET AL., *Respondents*.

*Peter J. Eglick* and *Jane S. Kiker* (of *Helsell Fetterman, L.L.P.*), for appellant.

*Christine O. Gregoire, Attorney General*, and *Sonia A. Wolfman, Assistant*; and *Jeffrey M. Eustis*, for respondents.

MORGAN, J. — The Floating Homes Association (FHA) appeals the Washington Department of Fish and Wildlife's issuance of a Hydraulic Project Approval (HPA) to Rome Ventura. We affirm.

RCW 77.55.100 governs the issuance of an HPA. It provides in part:

(1) In the event that any person . . . desires to construct any form of hydraulic project or perform other work that will

use . . . the natural flow or bed of any of the salt or fresh waters of the state, such person . . . shall, before commencing construction or work thereon and to ensure the proper protection of fish life, secure the approval of the department as to the adequacy of the means proposed for the protection of fish life. This approval shall not be unreasonably withheld . . . .

(2)(a) The department shall grant or deny approval of a standard permit within forty-five calendar days of the receipt of a complete application.

(b) . . . A complete application for approval shall contain general plans for the overall project, complete plans and specifications of the proposed construction or work within the mean higher high water line in salt water or within the ordinary high water line in fresh water, and complete plans and specifications for the proper protection of fish life.[1]

. . . .

(4) . . . If the department denies approval, the department shall provide the applicant, in writing, a statement of the specific reasons why and how the proposed project would adversely affect fish life. Protection of fish life shall be the only ground upon which approval may be denied or conditioned. Chapter 34.05 RCW applies to any denial of project approval, conditional approval, or requirements for project modification upon which approval may be contingent.[2]

Ventura owns property in Seattle. It is on the shore of Lake Union, and part of it is submerged in the lake. The submerged part is traversed by a right of way for the extension of a city street.

In January 1998, Ventura attached two barges to some old creosote pilings that existed in the submerged right of way. Each barge had a building constructed on it,[3] and Ventura began using the two buildings as a rowing club and

---

[1] These provisions are reiterated in WAC 220-110-030.

[2] Chapter 34.05 RCW is Washington's version of the Administrative Procedures Act.

[3] FHA alleges that each building is a two-story, 35-foot high structure, "with building-type siding, stone facing, a stone chimney, an interior fireplace and interior banquet/meeting rooms." Clerk's Papers (CP) at 30. We assume that its allegations are true.

meeting facility.[4] She failed to obtain the necessary permits, so the City of Seattle cited her. She responded by forfeiting $200 bail and suing the City civilly. The civil suit was removed to federal court and later settled. As part of the settlement, to which FHA was a party, Ventura agreed to move her barges out of the submerged right-of-way, and off the property unless she obtained the necessary permits.[5] It appears that the barges are still on the lake.[6]

On April 21, 1999, Ventura applied to the Department of Fish and Wildlife (WDFW) for an HPA. She asked to:

> Move the 2 barges approximately 17' to the south, (per a settlement agreement with neighbors and the City of Seattle). Remove finger piers & creosote pilings to accommodate this relocation. Relocate 5 pilings to which the barges are tied. Add 1 new piling at south dock to replace existing weak one.[7]

On April 27, 1999, WDFW indicated it would not permit the barges. It explained that the barges were "very damaging to fish habitat"; that it had "no intention of taking any action which might imply that this agency supports this habitat damage"; and that it was "request[ing] the City of Seattle to require the buildings and attached float be removed from state waters."[8] At the same time, however, it suggested that "[r]emoval of the finger piers and creosote pilings would be beneficial for fish habitat," and that it "could issue an HPA for that work."[9]

On May 4, 1999, Ventura amended her application in accordance with WDFW's suggestions. She now sought permission to:

---

[4] The parties refer to the barges and buildings as "floating structures."

[5] This is an approximation of the provisions found at CP at 131-32.

[6] See, e.g., Br. of Appellant at 22; Administrative R. (AR) at 454.

[7] Id.

[8] CP at 226.

[9] Id.

Remove finger piers & creosote pilings[;] relocate 5 existing steel pilings[;] add 1 steel piling.[10]

On May 14, 1999, WDFW granted an HPA for the work needed to construct new pilings. As amended on June 2, 1999, the HPA permitted Ventura to construct the new pilings a few feet south of the old creosote ones, outside of the submerged right-of-way. The HPA neither permitted nor prohibited the barges; it stated expressly that "[t]his HPA is for removal and installation of pilings *only*, and the Washington Department of Fish and Wildlife (WDFW) will continue to pursue restoration of fish habitat which has been damaged by the unpermitted construction of over-water structures at this site."[11] The HPA was based on a WDFW biologist's determination "that there would be a net benefit to fish life from moving the five existing piles and removing the creosote pilings and finger piers."[12]

Between June 2 and June 17, 1999, Ventura completed construction of the new steel pilings. During the same period, WDFW asked the City of Seattle to require Ventura "to remove the floating structures until the impacts of the structures have been fully evaluated and mitigated and all required permits have been obtained for them."[13]

On June 29, 1999, Ventura applied for an HPA permitting her to "retain 2 floating structures built aboard 2 barges."[14] On July 13, 1999, WDFW denied her application, finding that the barges would have "significant adverse impacts to fish life."[15]

On June 7, meanwhile, FHA filed an "informal" appeal of WDFW's decision to issue an HPA for the construction of

---

[10] CP at 229.

[11] CP at 234 (emphasis added).

[12] CP at 239.

[13] CP at 313.

[14] CP at 251.

[15] CP at 255.

new steel pilings.[16] Citing RCW 77.55.100(2)(b), it argued that WDFW could not lawfully issue an HPA to construct new pilings unless it prohibited the barges from being attached to such pilings.

On September 3, 1999, WDFW's acting assistant director denied FHA's "informal" appeal.[17] He ruled that replacing the old creosote pilings with new steel ones "would, in fact, result in a benefit to fish life, however modest, over pre-existing conditions."[18] Thus, the new pilings—but not the barges—should be permitted.

On September 29, 1999, FHA filed a "formal" appeal of WDFW's decision to permit the new pilings. FHA did not dispute that the new pilings would benefit fish; it contended, however, that WDFW could not lawfully permit the new pilings unless it affirmatively banned the two barges. A hearing examiner denied the appeal, concluding in part as follows:

12. Protection of fish life shall be the only grounds upon which a hydraulic project application may be denied or conditioned. . . .

13. There is no dispute that, considered alone, the removal of finger piers and creosote pilings and installation of new pilings constitutes a slight improvement to water quality and is not harmful to fish, either directly or indirectly.

14. WDFW has not committed error in distinguishing this work from placement of the floating buildings.[19]

FHA appealed from the hearing examiner to WDFW's director. The director decided that replacing the old creosote pilings with new steel ones would benefit fish, and that the new steel pilings should be permitted. He neither permitted nor prohibited the barges, leaving them instead for decision at a later time. He expressly stated that "[i]f

---

[16] CP at 242.

[17] AR 34.

[18] CP at 242.

[19] CP at 51.

and when [Ventura] submits an additional HPA application for attachment of floating buildings, and if [FHA] is aggrieved by WDFW's decision, *then* appeal may be taken from the Department's decision."[20]

FHA appealed from the director to the Thurston County Superior Court. FHA asked the court to issue an order "declaring the HPA denied, null and void,"[21] or an order "remanding the matter to the agency for the inclusion in the HPA of a condition prohibiting attachment of the floating structures [i.e., the barges] to the relocated pilings . . . ."[22] The superior court affirmed the director.

FHA now appeals from the superior court to this court. FHA does not challenge the director's finding that fish have benefited from replacing the old creosote pilings with new steel ones. FHA argues, however, that the director lacked discretion to treat the pilings as separate from the barges or to issue an HPA for the pilings without also banning the barges. WDFW *responds that the director acted within his discretion when he* "considered the piling project as a distinct work project requiring an HPA" and when he granted an HPA for the pilings only.[23]

As a result of these contentions, the dispositive question[24] is whether the director had discretion to permit the pilings without permitting or prohibiting the barges. FHA has the burden of showing that the director's decision was invalid.[25] To meet this burden, FHA must show that the director violated the law or exercised his discretion arbi-

---

[20] CP at 39 (emphasis added).

[21] CP at 34.

[22] CP at 34-35.

[23] Br. of Resp't (WDFW) at 1.

[24] We reject most of Ventura's claims regarding mootness. We neither accept nor reject her claim that the 1998 legislature stripped WDFW of any authority to abate the barges, *see* Laws of 1998, ch. 190, § 87(5), deeming it best not to address that question in this case.

[25] RCW 34.05.570(1)(a); *see also Evans v. Employment Sec. Dep't*, 72 Wn. App. 862, 865, 866 P.2d 687 (1994).

trarily and capriciously.[26] With respect to the law, FHA relies on subsection (2)(b) of RCW 77.55.100, *Bhatia v. Department of Ecology*,[27] and *Skokomish Indian Tribe v. Fitzsimmons*.[28]

■ The director did not violate subsection (2)(b) of RCW 77.55.100. The subsection provides that an application for an HPA shall be deemed complete when accompanied by (1) *general* plans for the overall project, (2) *complete* plans and specifications of the proposed construction or work within the mean higher high water line in salt water or within the ordinary high water line in fresh water, and (3) *complete* plans and specifications for the proper protection of fish life. This language contemplates that "the proposed construction or work" will be different from, and usually narrower than, "the overall project"; if that were not so, "complete plans and specifications of the proposed construction or work" would constitute *complete* plans for "the overall project," and the requirement of *"general* plans for the overall project" would be superfluous.[29] This language also contemplates that the director will rule on "the proposed construction or work" for which he has *complete* plans and specifications, as opposed to "the overall project" for which he has only *general* plans and *no* specifications. The entire subsection seems designed to restrict the director's discretion to delay vesting,[30] and not to restrict the director's discretion to issue an HPA for part but not all of an "overall project." We conclude that the subsection does not deprive the director of discretion to permit only "the proposed construction or work" for which an HPA is sought; that the

---

[26] RCW 34.05.570(3)(d), (3)(i).

[27] *Bhatia v. Dep't of Ecology*, No. 95-34, 1996 WL 538822 (Shorelines Hr'gs Bd. Jan. 9, 1996).

[28] 97 Wn. App. 84, 982 P.2d 1179 (1999), *review denied*, 143 Wn.2d 1018 (2000).

[29] *City of Kent v. Beigh*, 145 Wn.2d 33, 49, 32 P.3d 258 (2001) (courts will not interpret a statute so as to render any part of the language superfluous); *City of Seattle v. Dep't of Labor & Indus.*, 136 Wn.2d 693, 698, 965 P.2d 619 (1998) (a court must give effect to every part of the text of a statute, rendering no portion meaningless or superfluous).

[30] *E.g., Adams v. Thurston County*, 70 Wn. App. 471, 855 P.2d 284 (1993).

subsection does not *require* the director to permit or prohibit "the overall project"; and that the subsection does not *require* the director to rule on parts of an "overall project" that lie beyond the scope of an HPA application.

These conclusions are squarely supported by Division One's decision in *Northwest Steelhead & Salmon Council of Trout Unlimited v. Department of Fisheries.*[31] In that case, the "overall project" consisted of constructing (1) a new creekside house and (2) a bridge across the creek for access to the house. WDFW's director determined that the bridge would not harm fish, but that the house would. The landowner requested an HPA for the bridge only, and the director granted the request. The director neither permitted nor prohibited the house, ruling that it could be better regulated in SEPA (State Environmental Policy Act) proceedings convened by the city of Seattle. Affirming, Division One necessarily concluded (1) that the director possessed discretion to permit only "the proposed construction or work" (i.e., the bridge) and (2) that the director was not *required* to permit or prohibit "the overall project" (i.e., the house plus the bridge).

■ The director was not obligated to follow *Bhatia.*[32] *Bhatia* is an administrative decision that lacks precedential effect.[33] It also is distinguishable. It addressed whether the Shorelines Hearings Board (SHB) has *discretion* to address parts of a project not included in a permit application. It did not address whether the SHB (or WDFW by analogy) is *required* to address parts of a project not included in a permit application. Only the latter question is in issue here.

Nor was the director obligated to follow *Skokomish Indian Tribe.* That case held only that the Department of Ecology (DOE) acted arbitrarily when DOE filed a letter acceding to a federal dam project that DOE perceived to violate state law. It did not address whether WDFW is

---

[31] 78 Wn. App. 778, 896 P.2d 1292 (1995).

[32] 1996 WL 538822.

[33] *Timberlake Christian Fellowship v. King County,* 114 Wn. App. 174, 185 n.3, 61 P.3d 332 (2002) (administrative decision not binding on court; court may find guidance in agency's interpretation of the law).

*required* to permit or prohibit an "overall project" when "the proposed construction or work" is part but not all of that project.

■ ■ The remaining question is whether the director exercised his discretion arbitrarily or capriciously (or, in alternative terms, whether he abused his discretion). Agency action is not arbitrary or capricious if the evidence on which the agency based its decision leaves room for two opinions, even though one may believe an erroneous conclusion has been reached.[34] The director's mandate was to protect fish. He acted reasonably when he permitted new pilings, for they were beneficial to fish. He acted reasonably when he refrained from acting on the barges, for he was not required to predict that Ventura would maintain the barges on the lake in the absence of proper permits for them.[35] He acted reasonably in thinking that the barges could be addressed in a later HPA proceeding before him, or in SEPA, SMA (Shoreline Management Act of 1971), or maritime proceedings before the City, DOE, or Coast Guard, each of which was then active in the case. His decision to allow the pilings was reasonable at the time it was made; his decision to leave the barges for later was reasonable at the time it was made; and the evidence clearly leaves room for two opinions.

■ We reject FHA's argument[36] that the director was required, long after he made his decision, and apparently on his own motion, to amend the HPA based on "new biological or physical information." The director was required to base his decision on the evidence before him at the

[34] *Pierce County Sheriff v. Civil Serv. Comm'n*, 98 Wn.2d 690, 695, 658 P.2d 648 (1983); *Anderson v. Island County*, 81 Wn.2d 312, 317, 501 P.2d 594 (1972); *Lillions v. Gibbs*, 47 Wn.2d 629, 633, 289 P.2d 203 (1955), *overruled on other grounds by Fleming v. City of Tacoma*, 81 Wn.2d 292, 502 P.2d 327 (1972); *Skokomish Indian Tribe*, 97 Wn. App. at 93-94.

[35] We reject FHA's premise that the director was required to deny or condition a permit for the pilings based on speculation that Ventura would breach her settlement agreement or violate the law if she were unsuccessful in obtaining the necessary permits. At the time the director made his decision, Ventura was still attempting to obtain the necessary permits.

[36] *See* Reply Br. of Appellant at 7-10.

time he was making that decision, and we are required to review his decision based on that same evidence.

In the end, our holding is narrow. We have not considered the director's right (if any) to bring an original enforcement action with respect to the barges.[37] We have not considered FHA's right (if any) to sue based on a right of its own (e.g., the right (if any) to obtain a prohibitory injunction or the right (if any) to enforce the settlement agreement to which Ventura was a party). We have not considered whether the director is *permitted*, in the exercise of his or her sound discretion, to consider parts of an "overall project" that are not included in an HPA application. We have ruled only that the director is not *required* to consider (or has discretion not to consider) parts of an "overall project" that are not included in an HPA application. Based on this narrow ruling, we conclude that the director did not err in this case.

The parties' remaining arguments are not dispositive or not sufficiently significant to warrant discussion. FHA's request for reasonable attorney fees is denied. The judgment is affirmed.

BRIDGEWATER and ARMSTRONG, JJ., concur.

Review denied at 150 Wn.2d 1011 (2003).

---

[37] We doubt, though we need not decide today, that FHA could force the director to bring such an action. *See* RCW 34.05.570(4); *Heckler v. Chaney*, 470 U.S. 821, 831, 105 S. Ct. 1649, 84 L. Ed. 2d 714 (1985); *Sierra Club v.Whitman*, 268 F.3d 898, 902 (9th Cir. 2001); *Kixmiller v. Sec. & Exch. Comm'n*, 492 F.2d 641, 644 (D.C. Cir. 1974); *Nat'l Elec. Contractors Ass'n v. Riveland*, 138 Wn.2d 9, 31, 978 P.2d 481 (1999); 2 AM. JUR. 2D *Administrative Law* § 481 (1994). One might argue that this case, though disguised as an appeal, is really an effort to compel the director to take such enforcement action.