[No. 60623-4.    En Banc.    May 19, 1994.]

ERICKSON & ASSOCIATES, INC., ET AL, *Petitioners*, v. DENNIS J. McLERRAN, ET AL, *Respondents*.

*Oles, Morrison & Rinker*, by *David H. Karlen*, for petitioners.

*Mark H. Sidran, City Attorney*, and *Patrick J. Schneider* and *Robert D. Tobin, Assistants*, for respondents.

*Stephen M. Rummage, Thomas A. Goeltz*, and *Marco de Sa e Silva* on behalf of Building Industry Association of Washington, amicus curiae for petitioners.

*Patrick D. Sutherland, Prosecuting Attorney for Thurston County*, and *Thomas R. Bjorgen, Senior Deputy*, on behalf of the Association of Washington Cities, Washington Association of Prosecuting Attorneys, and Washington Association of Counties, amici curiae for respondents.

*David A. Bricklin* and *Michael W. Gendler* on behalf of Washington Environmental Council, amicus curiae for respondents.

JOHNSON, J. — This appeal involves the application of Washington's vested rights doctrine to master use permit applications. Petitioners, Erickson & Associates and Ron Danz (Erickson), challenge a City of Seattle ordinance that sets the vesting date for development projects. Under the city ordinance, Seattle Municipal Code (SMC) 23.76.026, a

development project vests (1) when the developer submits a complete building permit application, or (2) when the City earlier issues a master use permit without a building permit application. Erickson contends the ordinance is unconstitutional, arguing Washington's vested rights doctrine requires the City to vest development rights when a master use permit application is submitted rather than when it is issued. The trial court denied Erickson's summary judgment motion on this issue and the Court of Appeals affirmed. We agree.

## I

Master Use Permits (MUP's) are site plan approval permits employed by the City of Seattle to streamline the regulatory review process. MUP's are "umbrella" or "master" permits, which actually represent a number of independent regulatory components, including environmental impact review, comprehensive plan review, and other *use* inquiries. MUP's are mandatory for development in Seattle; however, MUP review is an iterative process. Developers may have general concepts in mind for development of property, and want to explore various scenarios with the municipality. In response to municipal feedback, project plans change and evolve. As plans develop, the specific requirements of a particular MUP may change. The MUP process makes it easier for developers and citizens to get through the land use regulatory review process by having one employee designated as the applicant's "contact" person.

On July 5, 1990, Erickson submitted a MUP application to the City of Seattle's Department of Construction and Land Use (DCLU). Erickson sought "use approval" for a commercial and residential project it proposed to build in the city. The proposed project consisted of residential units, approximately 4,500 square feet of commercial space, and 43 parking stalls. Erickson did not submit a building permit application for this project.

During the permitting process, the Seattle City Council passed an interim ordinance, SMC 25.09, in response to the

Growth Management Act's requirement that local governments adopt critical areas ordinances. RCW 36.70A.060(2). The ordinance applies to properties with steep slopes or other sensitive features such as wetlands, and prohibits more than 40 percent of applicable properties to be covered with impermeable surfaces such as parking lots, driveways, or roofs. SMC 25.09.

During the review of Erickson's MUP application, DCLU determined part of Erickson's project was located on slopes steep enough to qualify as a "critical area" under the new ordinance. After finding Erickson proposed to cover approximately 80 percent of the property with impervious surfaces, DCLU sent written notice that Erickson would have to revise the project, conform it to the ordinance, or obtain a reasonable use exception from the requirements of the ordinance.

Instead, Erickson filed a petition for a writ of certiorari to challenge the application of the critical areas ordinance to its project. Erickson claimed that, like a building permit, the MUP application vested on the date it was filed. The trial court quashed the writ of review because Erickson did not first seek a reasonable use exception. Erickson then sought and was denied the exception.

Having exhausted administrative remedies, Erickson moved for partial summary judgment on the vested rights issue. The trial court denied Erickson's summary judgment motion. Erickson appealed to Division One of the Court of Appeals. The Court of Appeals affirmed the trial court, upholding the constitutionality of SMC 23.76.026. *Erickson & Assocs., Inc. v. McLerran*, 69 Wn. App. 564, 570, 849 P.2d 688 (1993). Erickson now appeals that judgment.

## II

At issue in this case is whether Washington's vested rights doctrine applies to the filing of a completed MUP application as it does to the filing of a building permit application.

Washington's doctrine of vested rights entitles developers to have a land development proposal processed under the

regulations in effect at the time a complete building permit application is filed, regardless of subsequent changes in zoning or other land use regulations. *West Main Assocs. v. Bellevue*, 106 Wn.2d 47, 720 P.2d 782 (1986); *Hull v. Hunt*, 53 Wn.2d 125, 331 P.2d 856 (1958); *State ex rel. Ogden v. Bellevue*, 45 Wn.2d 492, 275 P.2d 899 (1954); Richard L. Settle, *Washington Land Use and Environmental Law and Practice* § 2.7 (1983). The building permit application must (1) be sufficiently complete, (2) comply with existing zoning ordinances and building codes, and (3) be filed during the effective period of the zoning ordinances under which the developer seeks to develop. *Valley View Indus. Park v. Redmond*, 107 Wn.2d 621, 638, 733 P.2d 182 (1987).

In 1987, the Legislature codified these principles. Laws of 1987, ch. 104, pp. 317-18 (codified at RCW 19.27.095(1)). RCW 19.27.095(1) provides:

> A valid and fully complete building permit application for a structure, that is permitted under the zoning or other land use control ordinances in effect on the date of the application shall be considered under the building permit ordinance in effect at the time of application, and the zoning or other land use control ordinances in effect on the date of application.

Washington's vesting rule runs counter to the overwhelming majority rule that "development is not immune from subsequently adopted regulations until a building permit has been obtained and substantial development has occurred in reliance on the permit." Settle, *supra* at 40. This court rejected the reliance-based majority rule, instead embracing a vesting principle which places great emphasis on certainty and predictability in land use regulations. *West Main Assocs.*, 106 Wn.2d at 51. "The purpose of the vesting doctrine is to allow developers to determine, or 'fix,' the rules that will govern their land development." *West Main Assocs.*, 106 Wn.2d at 51.

At issue here is an ordinance that regulates the vesting date for Seattle master use permits. Seattle Municipal Code 23.76.026, "Vesting of development rights", reads in pertinent part:

Applications for all master use permit components except subdivisions and short subdivisions shall be considered under the Land Use Code and other land use control ordinances in effect on the date a fully complete building permit application, meeting the requirements of Section 302 of the Seattle Building Code, is filed. Until a complete building permit application is filed, such Master Use Permit applications shall be reviewed subject to any zoning or other land use control ordinances that become effective prior to the date that notice of the Director's decision on the application is published, if the decision can be appealed to the Hearing Examiner, or prior to the date of the Director's decision if no Hearing Examiner appeal is available.

(Footnote omitted.) SMC 23.76.026. Under the Seattle ordinance, vesting occurs either (1) when a developer files a complete building permit application at any point in the MUP permitting process (known as a "combined MUP"), or (2) when the MUP is issued by the City, even if no building permit has been submitted (known as a straight MUP).

Erickson challenges the constitutionality of SMC 23.76-.026, arguing the ordinance infringes upon development interests and violates Erickson's due process right to be treated in a fair manner by the City. Erickson contends the vested rights doctrine is not limited to building permit applications and the doctrine requires the City to process MUP applications according to the land use regulations in effect at the time a MUP is filed. Erickson further argues land development in Washington has become increasingly complex, discretionary, and expensive and the vested rights doctrine will afford property owners little protection if its scope is limited to building permit applications.

### III

■ Erickson first argues SMC 23.76.026 is constitutionally defective. When reviewing a constitutional challenge to a legislative enactment we presume the enactment is constitutional, and the party challenging the enactment bears the burden of proving it unconstitutional beyond a reasonable doubt. *State v. Brayman*, 110 Wn.2d 183, 193, 751 P.2d 294 (1988); *Tekoa Constr., Inc. v. Seattle*, 56 Wn. App. 28, 34, 781 P.2d 1324 (1989), *review denied*, 114 Wn.2d 1005 (1990).

■ Erickson correctly asserts our vesting doctrine is rooted in constitutional principles of fundamental fairness. The doctrine reflects a recognition that development rights represent a valuable and protectable property right. *West Main Assocs.*, 106 Wn.2d at 50 (citing *Louthan v. King Cy.*, 94 Wn.2d 422, 428, 617 P.2d 977 (1980)). By promoting a date certain vesting point, our doctrine insures "that new land-use ordinances do not unduly oppress development rights, thereby denying a property owner's right to due process under the law." *Valley View Indus. Park*, 107 Wn.2d at 637. Our vested rights cases thus establish the constitutional minimum: a "date certain" standard that satisfies due process requirements. *Hull*, 53 Wn.2d at 130.

Seattle contends its vesting ordinance complies with the minimum requirements set forth by this court and by statute. We agree. Under SMC 23.76.026 the vesting point for a MUP application is controllable by a developer, and, in all instances, vesting occurs no later than the building permit application stage. At any point in the MUP review process a developer can file a complete building permit application. The developer's rights then vest and the City must process the proposed project under the then existing land use and construction ordinances.

Because its ordinance complies with the statutory and common law vesting requirements, Seattle argues it should not be required to vest development rights earlier, at the outset of the MUP review stage. Erickson contends, however, the constitutional principles underlying the vested rights doctrine require Seattle to apply the rules applicable to vesting in the building permit context to MUP applications. Seattle's failure to do so, Erickson argues, ignores the constitutional underpinnings of the vested rights doctrine and ignores the practicalities of modern property development.

Both parties agree MUP's are now a critical part of the development process. Therefore, Erickson argues, under Seattle's land use permitting scheme, the need for certainty is greatest at the use review stage and the vested rights

doctrine should protect development rights when a developer applies for a MUP. Erickson's arguments ignore that the City's ordinance does afford developers certainty and predictability required by due process. A developer controls the date of vesting by selecting the time at which he/she chooses to submit a completed building application. Here, Erickson opted for the straight MUP process, under which no vesting occurs until the MUP is approved. Under Seattle's ordinance, Erickson could have protected its rights by filing a building permit at the beginning or at any point in the process. Erickson failed to do so, even though "*[t]he MUP application met all requirements then in effect, and the MUP was just about to be issued*" when the Seattle City Council enacted the critical areas ordinance. Pet. for Review, at 2-3.

Erickson further argues Seattle's vesting ordinance gives the City limitless discretion to delay the issuance of a MUP, so as to bring a proposed project within the scope of new land use regulations. We disagree. This is not a case where the City has reserved for itself the sole discretion to determine the date of vesting. *See, e.g., West Main Assocs.*, 106 Wn.2d at 52-53 (court struck down a municipal ordinance requiring, along with the filing of a complete building permit, city approval of several additional permits before development rights vested); *see also Adams v. Thurston Cy.*, 70 Wn. App. 471, 855 P.2d 284 (1993). Erickson does not argue the City acted in bad faith with respect to Erickson's application. Even absent rigid deadlines, the City is still obligated to act in good faith when processing MUP applications.

Erickson next argues the vested rights doctrine is not limited to building permit applications, but instead applies to other land development permits. Erickson contends the Court of Appeals decision in this case conflicts with prior decisions applying the vested rights doctrine in other contexts. *See, e.g., Talbot v. Gray*, 11 Wn. App. 807, 811, 525 P.2d 801 (1974) (shoreline permit), *review denied*, 85 Wn.2d 1001 (1975); *Juanita Bay Vly. Comm'ty Ass'n v. Kirkland*, 9 Wn. App. 59, 83-84, 510 P.2d 1140 (grading permit), *review*

*denied,* 83 Wn.2d 1002 (1973); *Ford v. Bellingham-Whatcom Cy. Dist. Bd. of Health,* 16 Wn. App. 709, 715, 558 P.2d 821 (1977) (septic tank permit); *but see Norco Constr., Inc. v. King Cy.,* 97 Wn.2d 680, 649 P.2d 103 (1982) (court declined to extend the vested rights doctrine to preliminary plat applications). In support of this argument, Erickson relies on two cases in which courts have applied the vested rights doctrine to use permit applications. *See Victoria Tower Partnership v. Seattle,* 49 Wn. App. 755, 745 P.2d 1328 (1987), *appeal after remand,* 59 Wn. App. 592, 800 P.2d 380 (1990), *review denied,* 116 Wn.2d 1012 (1991); *Beach v. Board of Adj.,* 73 Wn.2d 343, 438 P.2d 617 (1968).

Erickson's argument is not persuasive. Neither *Beach* nor *Victoria Tower* controls the outcome of this case because neither case involved a vesting ordinance like the one at issue here. *Beach* involved a conditional use permit. The determinative issue was whether a verbatim record of proceedings was required to establish an adequate record for review. The court held a verbatim record of administrative proceedings was necessary to enable judicial review under a writ of review. Because no such record existed, the case was remanded for a new hearing on the developer's conditional use permit application. *Beach,* 73 Wn.2d at 347. The conditional use permit at issue in *Beach* does not support Erickson's argument regarding the MUP vesting scheme at issue here.

*Victoria Tower* is likewise inapplicable here. Like this case, *Victoria Tower* involved a Seattle MUP application. Appellants argued, and the Court of Appeals agreed, the City's application of newly adopted environmental policies to its MUP application violated Victoria Tower's vested rights. *Victoria Tower,* 49 Wn. App. at 763. However, the analysis in *Victoria Tower* is inapposite here because the vesting ordinance at issue in this case, SMC 23.76.026, was not adopted until 1985, approximately 5 years after the *Victoria Tower* appellant's application was filed.

■ We agree with Erickson that our prior cases apply the vested rights doctrine in other contexts beside building per-

mits. However, none of these cases prevent a municipality from developing a vesting scheme like the one in place in Seattle. Our vested rights doctrine is not a blanket rule requiring cities and towns to process all permit applications according to the rules in place at the outset of the permit review. Instead, the doctrine places limits on municipal discretion and permits landowners or developers "to plan their conduct with reasonable certainty of the legal consequences". *West Main Assocs.*, 106 Wn.2d at 51. Within the parameters of the doctrine established by statutory and case law, municipalities are free to develop vesting schemes best suited to the needs of a particular locality.

Erickson lastly argues the practicalities of modern property development require us to extend the vested rights doctrine to Seattle's MUP process to maintain the balance of private and public interests embodied in the doctrine. Both parties agree land development in Washington has become an increasingly complex, discretionary, and expensive process. Additionally, both parties agree the MUP review process is now a critical stage in Seattle property development. Land use, zoning, and environmental regulations all must be satisfied before a MUP will be issued. The parties disagree, however, on what impact these requirements should have on the vesting doctrine. Erickson asserts the increasingly onerous nature of land use review makes the use review (such as Seattle's MUP process), rather than building permit review, the critical stage in land use regulation and requires the application of the vested rights doctrine to MUP's. The City contends its ordinance responds to the increased burden on developers by creating a process where the developer can control and defer the costs associated with permitting.

Development interests and due process rights protected by the vested rights doctrine come at a cost to the public interest. The practical effect of recognizing a vested right is to sanction the creation of a new nonconforming use. A proposed development which does not conform to newly adopted laws is, by definition, inimical to the public interest

embodied in those laws. If a vested right is too easily granted, the public interest is subverted.

This court recognized the tension between public and private interests when it adopted Washington's vested rights doctrine. The court balanced the private property and due process rights against the public interest by selecting a vesting point which prevents "permit speculation", and which demonstrates substantial commitment by the developer, such that the good faith of the applicant is generally assured. The application for a building permit demonstrates the requisite level of commitment. In *Hull v. Hunt, supra,* this court explained, "the cost of preparing plans and meeting the requirements of most building departments is such that there will generally be a good faith expectation of acquiring title or possession for the purposes of building . . .". *Hull,* 53 Wn.2d at 130.

Erickson argues the cost of preparing and submitting a MUP likewise poses a significant burden on developers. The MUP process is sufficiently expensive, contends Erickson, so as to prevent permit speculation and to give the developer a stake in the process that should be protected.

We reject Erickson's argument for several reasons. First, Erickson's cost-based arguments fail because substantial dollar figures alone do not demonstrate a significant burden on developers. The cost of obtaining a MUP varies greatly depending on the complexity of the proposal. It is the relative cost of the application compared to the total project cost that should be considered in evaluating the deterrent effect of the MUP application's cost to speculation in development permits. Second, we reject a cost-based analysis that reintroduces the case-by-case review of a developer's reliance interest we rejected 40 years ago when we adopted the vested rights doctrine.

Third, unlike building permit applications, MUP applications may be submitted at the infancy of a proposed development project. Much of the cost associated with MUP applications may be incurred *after* the application is filed. If, as Erickson urges, vested rights apply to MUP applications,

developers can vest valuable development rights prior to any substantial commitment to a project. Thus, the necessary indicia of good faith and substantial commitment are lacking at the outset of the master use permitting process.

Finally, Erickson points to no cases from this state or any other jurisdiction that support expanding the vesting doctrine beyond its current limits. Erickson concedes our State's doctrine is already one of the most protective of developer's rights.

The City's vesting ordinance strikes a proper balance between developers' rights and public interest. As a project progresses through MUP review, its plans mature and grow increasingly concrete. At the same time the developer's interest matures. The City's vesting ordinance permits a developer to vest development rights, when, in the best judgment of the developer, it makes economic sense to do so. The developer, working with the City, is in the best position to make this determination, and, like the Court of Appeals, "[w]e see no good policy reasons to prevent local governments from providing this alternative to developers". *Erickson*, 69 Wn. App. at 569.

Erickson urges us to "modernize" the doctrine in light of the substantial increase in land use regulations adopted by the Legislature in recent years. We agree with Erickson that Washington has undergone a sea change with respect to land use regulation. However, from this observation we reach a different conclusion.

Underlying the dispute in this case is a newly enacted critical areas ordinance, adopted by the City of Seattle under the requirements of the Growth Management Act. RCW 36.70A. The Legislature's passage of both the Growth Management Act (Act) and the State Environmental Policy Act of 1971 (SEPA) reflects public recognition that the influences of population growth, industrialization, and urbanization require us to place greater emphasis on natural resource protection and urban planning. The Growth Management Act begins with the following legislative findings:

The legislature finds that uncoordinated and unplanned growth, together with a lack of common goals expressing the public's interest in the conservation and the wise use of our lands, pose a threat to the environment, sustainable economic development, and the health, safety, and high quality of life enjoyed by residents of this state. It is in the public interest that citizens, communities, local governments, and the private sector cooperate and coordinate with one another in comprehensive land use planning. Further, the legislature finds that it is in the public interest that economic development programs be shared with communities experiencing insufficient economic growth.

RCW 36.70A.010. SEPA begins with similar findings. *See* RCW 43.21C.020.

The legislative findings in both SEPA and the Growth Management Act demonstrate the Legislature's understanding that greater regulation of property use is necessary to accomplish the goals set forth in both acts. Additionally, these findings reflect a legislative awareness that land is scarce, land use decisions are largely permanent, and, particularly in urban areas, land use decisions affect not only the individual property owner or developer, but entire communities.

The Growth Management Act imposed substantial new requirements on local governments. Under the Act, most counties and municipalities must establish comprehensive development plans, identify natural resources and critical areas, as well as develop a variety of regulations consistent with the Act and the local development plans. *See* RCW 36.70A.060.170. The Act further mandates that localities act quickly, placing strict compliance deadlines for each requirement. Here, the Growth Management Act required Seattle to have a critical areas ordinance in place by September 1, 1991. RCW 36.70A.060. Given the substantial legislative activity in land use law, we are unwilling to modify or expand the vested rights *doctrine* unless it is required to protect the constitutional interests at stake.

IV

In sum, the MUP review procedures developed by the City promote review process efficiency and effective interac-

tion between the permit applicant and the City and it maximizes developer flexibility and business judgment. Our vested rights doctrine does not require the City to process MUP applications under the regulations in place at the infancy of the review process. Nor are we persuaded that changes in land use law warrant an expansion of the doctrine. We hold SMC 23.76.026 is constitutional and satisfies the requirements of case and statutory law.

Accordingly, the decision of the Court of Appeals is affirmed.

ANDERSEN, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DURHAM, SMITH, GUY, and MADSEN, JJ., concur.