[No. 35383-1-II.   Division Two.   October 9, 2007.]

ABBEY ROAD GROUP, LLC, ET AL., *Respondents*, v. THE CITY OF BONNEY LAKE, *Appellant*.

---

186

*Jeffrey Ganson* and *Lisa M. Worthington-Brown* (of *Dionne & Rorick*), for appellant.

*Loren D. Combs* and *Gregory F. Amann* (of *McGavick Graves, PS*), for respondents.

¶1 VAN DEREN, A.C.J. — The City of Bonney Lake asks us to reverse the superior court's decision reversing a hearing examiner's decision denying vested development rights to Abbey Road Group, LLC[1] for a 575-unit condominium project within Bonney Lake. Bonney Lake contends that Abbey Road's site plan review application did not vest development rights under Washington's vested rights doctrine based on (1) *Erickson & Associates, Inc. v. McLerran*, 123 Wn.2d 864, 872 P.2d 1090 (1994) and (2) Abbey Road's failure to file an application for a building permit as required by RCW 19.27.095(1). We agree with Bonney Lake, reverse the superior court, and affirm the hearing examiner's decision that development rights did not vest because Abbey Road failed to file a building permit application before Bonney Lake adopted new zoning and permit standards applicable to Abbey Lake's property within its city limits.

## FACTS

¶2 Abbey Road proposed to build a 575-unit condominium project on 36.51 acres within the City of Bonney Lake. In Bonney Lake, Title 14 of the Bonney Lake Municipal Code (BLMC)[2] governs development procedures. Title 14 does not articulate a vesting scheme or specifically state that a building permit is required for development project rights to vest. Generally, review and approval of a

---

[1] We refer to Abbey Road Group, LLC; Karl J. and Virginia S. Thun; Thomas Pavolka; Virginia Leslie Revocable Trust; and William and Louise Leslie Family Revocable Trust collectively as "Abbey Road."

[2] Title 14 of the BLMC is attached to the Administrative Record.

proposed development plan is separate and apart from review and approval of a building permit application, although both parts of a project require city approval. *See* BLMC 14.50.060(C).

¶3 On June 15, 2005, Abbey Road representatives attended a preapplication meeting with Bonney Lake.[3] At the meeting, Bonney Lake distributed a nine-page letter containing a paragraph entitled "Land Use Review Process," which stated:

> The zoning of the subject site is Commercial (C-2). Pursuant to BLMC Section 18.26.020, the C-2 zoning district permits multi-family development, subject to a Type 3 permit under BLMC Chapter 14.50, and environmental review under the State Environmental Policy Act [of 1971, chapter 43.21C RCW] (SEPA), if applicable. All application material is included and all information requested on the application forms (Building Permit and Planning Department) shall be submitted in order for a complete application. A Type 3 permit is approved by the [Director of the Bonney Lake Planning and Community Development Department (Director)] and can be appealed to the Bonney Lake Hearing Examiner.

Administrative R. (AR) Ex. 15, at 1-2.[4] The letter generally reviewed the information required for the site development plan review and indicated that the land use application fees

---

[3] Initially, Bonney Lake requires an applicant to provide a development proposal for the city to review. Ch. 14.50 BLMC. The development code's purpose is "to promote the health, safety and general welfare by guiding review of development in the city consistent with the city of Bonney Lake comprehensive plan." BLMC 14.10.020. As part of the review process, the director of planning and community development "may require a potential applicant to participate in a pre-application conference." BLMC 14.50.005. After a Type 3 permit application is complete and a 15-day period for public comment has passed, the director has 120 days to issue a decision. BLMC 14.50.020, .030, .050. The developer then has 15 days to appeal, and the issuance of a building permit is prohibited until the applicable 15 day appeal period has passed. BLMC 14.50.060.

[4] We refer to the Type 3 permit application review as the "site development plan review" for clarity.

for the review were $3,674, but it noted that "other fees for building permits" were also required.[5] AR Ex. 15, at 2.

¶4 The letter also listed the following requirements for the site development plan review: SEPA checklist, public notification, preliminary storm water report, traffic impact analysis, various site plan versions, landscape and road/pedestrian plan, geotechnical report, and hydrogeologic impact study. The closing paragraph of the letter stated:

> This letter reflects the information provided at the preapplication meeting and is intended to assist you in preparing plans and materials for formal application. We hope you found the comments useful to your project. We have made every effort to identify major issues to eliminate surprises during the City's review of the formal application. *The completion of the preapplication process in the content of this letter does not vest any future project application.* Comments in this letter are only valid for one year.
>
> As you know, this is a preliminary review only and does not take the place of the full review that will follow submission of a formal application. Comments provided in this letter are based on preapplication materials submitted.

AR Ex. 15, at 9 (emphasis added).

¶5 Abbey Road embarked on the development process, expending some $96,500[6] in the process and, on September 13, 2005, it submitted its application for the site development plan review. Later that day, the Bonney Lake City Council passed an ordinance rezoning the subject property to Residential/Conservation District (RC-5), a zoning category that precludes the multifamily development Abbey Road envisioned. Bonney Lake rezoned 65 acres, including Abbey Road's property, to bring the area into compliance with Bonney Lake's Future Land Use Map.

---

[5] BLMC 15.04.072 establishes how building permit fees are calculated. BLMC 15.04.080 establishes how building plan review fees are calculated.

[6] This expenditure amount is from the hearing examiner's findings. The record reflects other amounts up to $228,000. Abbey Road did not dispute the hearing examiner's finding.

¶6 In a letter dated October 12, 2005, the Director notified Abbey Road that its project was not vested under the prior ordinance because Abbey Road had not filed a building permit application. Abbey Road appealed the Director's determination.

¶7 The parties disputed the testimony before the hearing examiner about whether the city officials who attended the preapplication meeting also orally advised the Abbey Road representatives that vesting occurred only with the building permit application. City officials all agreed that there was no ambiguity about the necessity of a building permit application to vest Abbey Road's development rights to this project, while the Abbey Road participants claimed that the city did not give them a direct answer to their questions. But the evidence included the June 15 letter informing Abbey Road that "[i]n addition to this preapplication letter, please examine the complete BLMC and other relevant codes carefully," and that completion of the preapplication process "does not vest any future project application." AR Ex. 15, at 9.

¶8 The hearing examiner found that the Director correctly determined that

[t]he submittal of a completed application for a Type 3 permit pursuant to Chapter 14.50 BLMC does not vest a multi-family or commercial project allowed outright by the applicable C-2 zone classification. An applicant must submit a completed application for a building permit to vest the project. [*Erickson*, 123 Wn.2d 864]; *Noble Manor Company v. Pierce County*, 133 Wn.2d 269[, 943 P.2d 1378] (1997).

Clerk's Papers (CP) at 37.

¶9 Abbey Road filed a petition under the Land Use Petition Act (LUPA), chapter 36.70C RCW, seeking to reverse the hearing examiner's decision. And the superior court reversed the hearing examiner's decision, concluding:

2. [Abbey Road] was required by [Bonney Lake] to submit a Type 3 site development permit application . . . which they did do in a complete and timely fashion on September 13, 2005.

3. [Abbey Road's] complete Type 3 site development permit application . . . is vested under the zoning and other land use control ordinances in effect at the time the complete application was filed. . . .

4. [Abbey Road has] a vested right to develop the [p]roperty in accordance with [its] site development permit application under the zoning and other land use control ordinances in effect at the time the complete application was filed on September 13, 2005;

5. [Abbey Road's] Type 3 site development permit application . . . and . . . development . . . are not subject to [the postapplication ordinance that rezoned the property].

CP at 115-16.

¶10 Bonney Lake appeals.

## ANALYSIS

¶11 Bonney Lake contends that (1) the hearing examiner properly determined that *Erickson* was controlling and, therefore, the hearing examiner did not erroneously interpret the law; (2) the hearing examiner properly applied the law to the facts in determining that Abbey Road's application for a site development plan review did not vest rights because Abbey Road never filed a building permit application; and (3) the hearing examiner properly determined that Abbey Road's constitutional rights were not violated because Bonney Lake's procedures comport with public policy and were not unduly burdensome such that they improperly frustrated vesting.

¶12 Abbey Road urges us to affirm the trial court, arguing that *Erickson* is not controlling authority and, therefore, the trial court correctly concluded that filing an application for site development plan review vested the project. In support, Abbey Road asserts that Washington's common law vested rights doctrine has been vicariously expanded or, in the alternative, we should expressly expand the vested rights doctrine to protect its due process rights.

I. STANDARD OF REVIEW

■ ¶13 Under LUPA, we stand "in the shoes of the superior court" and limit our review to the record before the hearing examiner. *Pavlina v. City of Vancouver*, 122 Wn. App. 520, 525, 94 P.3d 366 (2004); RCW 36.70C.120. As the party seeking relief from the hearing examiner's decision, Abbey Road bears the burden of proving one of the six bases for relief under chapter 36.70 RCW:

(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;

(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

(d) The land use decision is a clearly erroneous application of the law to the facts;

(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or

(f) The land use decision violates the constitutional rights of the party seeking relief.

RCW 36.70C.130(1). Abbey Road challenges the hearing examiner's decision under (b), (c), (d), and (f), asserting that the hearing examiner's decision was an erroneous interpretation of the law, was a clearly erroneous application of the law to the facts not supported by substantial evidence,[7] and violated Abbey Road's constitutional rights.

■ ■ ¶14 Subsections (b) and (f) present questions of law that we review de novo. *Cingular Wireless, LLC v. Thurston County*, 131 Wn. App. 756, 768, 129 P.3d 300 (2006). Subsection (d) requires a showing of a clearly er-

---

[7] Abbey Road states that it "does not believe [the hearing examiner's disputed] findings are directly pertinent to the legal issue of vesting." Br. of Resp't at 47. We agree and do not further address whether there was substantial evidence to support the hearing examiner's decision.

roneous application of the law to the facts. Under the clearly erroneous standard, the reviewing court may find a decision clearly erroneous only when it is left with the definite and firm conviction that the hearing examiner made a mistake. *Cingular*, 131 Wn. App. at 768.

## II. WASHINGTON'S VESTED RIGHTS DOCTRINE

■ ¶15 Common law vesting rules protect individuals who have taken substantial steps to develop their property in reliance on prior zoning regulations when zoning is changed before development of their property is completed. 8 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 25.157 (3d ed. 2000). But the Washington Supreme Court long ago rejected any requirement for a change of position and substantial reliance to vest development rights and held:

> Notwithstanding the weight of authority, we prefer to have a date certain upon which the right vests to construct in accordance with the building permit. . . . The more practical rule to administer, we feel, is that the right vests when the party, property owner or not, applies for his building permit, if that permit is thereafter issued. This rule, of course, assumes that the permit applied for and granted be consistent with the zoning ordinances and building codes in force at the time of application for the permit.

*Hull v. Hunt*, 53 Wn.2d 125, 130, 331 P.2d 856 (1958). Thus, Washington's date certain common law vested rights doctrine "entitles developers to have a land development proposal processed under the regulations in effect at the time a complete building permit application is filed, regardless of subsequent changes in zoning or other land use regulations." *Erickson*, 123 Wn.2d at 867-68.

¶16 In 1987, the legislature codified Washington's common law vested rights doctrine.[8] LAWS OF 1987, ch. 104 (*codified as* RCW 19.27.095(1)). RCW 19.27.095(1) states:

> A valid and fully complete building permit application for a structure, that is permitted under the zoning or other land use control ordinances in effect on the date of the application shall be considered under the building permit ordinance in effect at the time of application, and the zoning or other land use control ordinances in effect on the date of application.

III. BUILDING PERMIT APPLICATION

¶17 Bonney Lake contends that because Abbey Road did not submit a building permit application no development rights vested and, therefore, the hearing examiner properly applied the law to the facts under RCW 36.70C.130(1)(d).

¶18 RCW 19.27.095(1) is unequivocal and requires a "valid and fully complete building permit application" be submitted for development rights to vest "on the date of the application." Abbey Road points to no authority entitling the courts to ignore this legislative directive, and the record is devoid of any claim that Abbey Road did, in fact, submit a building permit application. Therefore, because it is undisputed that Abbey Road did not submit a building permit application, it has not sustained its burden to show that the hearing examiner erroneously interpreted Washington's vested rights doctrine or erroneously applied the law to the facts. RCW 36.70C.130(1)(b), (d), (f).

IV. VICARIOUS EXPANSION OF VESTED RIGHTS DOCTRINE

¶19 Abbey Road alternatively asserts that *Victoria Tower Partnership v. City of Seattle*, 49 Wn. App. 755, 745 P.2d 1328 (1987) (*Victoria Tower I*) "is controlling." Br. of Appellant at 21. Abbey Road's argument suggests that, because Bonney Lake's site development plan review re-

---

[8] Washington's vesting rules have been expanded to include applications for short plat approval and conditional use permits. *See* RCW 58.17.033; *Weyerhaeuser v. Pierce County*, 95 Wn. App. 883, 976 P.2d 1279 (1999).

quirements are similar to those for the master use permit (MUP) at issue in *Victoria Tower* I, the vested rights doctrine has been vicariously expanded to include filing an application for site development plan review. This assertion is without merit.

¶20 In *Victoria Tower*, Seattle attempted to modify existing development rights after it adopted new ordinances in response to SEPA. 49 Wn. App. at 757. Division One initially remanded the case, holding that Seattle could not modify vested rights based on the new ordinances under the vested rights doctrine. *Victoria Tower* I, 49 Wn. App. at 762-63. On remand, Seattle's city council reaffirmed its earlier decision by relying on policies that were adopted before the developers filed their building permit application. *Victoria Tower P'ship v. City of Seattle*, 59 Wn. App. 592, 595-96, 800 P.2d 380 (1990) (*Victoria Tower* II). Division One upheld the city council's second decision, concluding that it was consistent with due process and clearly not erroneous. *Victoria Tower* II, 59 Wn. App. at 605.

¶21 Although Abbey Road admits that the "vesting doctrine for building permits was well settled at the time" of the *Victoria Tower* I decision, it asserts that the developer's application in *Victoria Tower* was for a MUP and not for a building permit. Br. of Resp't at 22. Apparently Abbey Road reasons that Division One must have determined that filing a MUP application vested development rights. But a fair reading of both *Victoria Tower* decisions does not support Abbey Road's conclusion. In fact, both *Victoria Tower* decisions repeatedly refer to the developer's building permit application. 49 Wn. App. at 758-62; *see also* 59 Wn. App. at 604. Therefore, either the *Victoria Tower* courts assumed that the two types of permits were equivalent or the distinction between a MUP and a building permit was not before those courts. *See Erickson & Assocs., Inc. v. McLerran*, 69 Wn. App. 564, 568, 849 P.2d 688 (1993).

¶22 Contrary to Abbey Road's argument, *Victoria Tower* II is entirely consistent with Washington's common law vested rights doctrine that has long required a building

permit application to preserve development rights under the building codes in effect when it was filed. Moreover, the legislature codified the common law vesting rules in 1987, the year that Division One decided *Victoria Tower* I. Thus, Abbey Road's reliance on *Victoria Tower* I is misplaced and neither the vested rights statute nor the common law vested rights doctrine has been expanded to include an application for the review of the site development plan at issue here.

## V. EXPANSION OF VESTED RIGHTS DOCTRINE To PROTECT DUE PROCESS RIGHTS

■ ¶23 Abbey Road also urges expansion of the vested rights doctrine to allow vesting when an applicant files an application for review of a site development plan. Abbey Road argues that Bonney Lake's procedures frustrate vesting and are unduly burdensome and, therefore, expanding Washington's vested rights doctrine is appropriate. Br. of Resp't at 44-45.

¶24 The hearing examiner found that

> [Bonney Lake's] procedure most closely approximates that of the City of Seattle in [*Erickson*, 123 Wn.2d 864]. Although [Bonney Lake] does not have a vesting ordinance as did Seattle, the Washington Supreme Court would refuse to extend the vested rights doctrine to a Type 3 permit application the same as it did in Seattle's MUP. The MUP is similar to the City's Type 3 permit and does not defeat vesting as an MUP applicant may vest rights at any time.

CP at 38. Abbey Road disagrees with the hearing examiner's conclusion, asserting that the issue in *Erickson* was the validity of a vesting ordinance and, therefore, it is inapposite.[9] But in *Erickson*, the Washington Supreme Court

---

[9] Abbey Road also asserts that "the *Erickson* court misinterpreted vested rights case law." Br. of Resp't at 11. But *Erickson* is binding precedent and we do not reconsider our Supreme Court's decisions. We, therefore, do not further address this claim.

specifically addressed and refused to expand the vested rights doctrine.

¶25 The Seattle ordinance at issue in *Erickson* allowed vesting when a building permit application was *submitted* or when a MUP was *issued*. *Erickson*, 123 Wn.2d at 866. In *Erickson*, the developers first contended that, contrary to Seattle's vesting ordinance, the vested rights doctrine allowed development rights to vest when a MUP was submitted but also argued that, if the court found that the rights did not vest, the court should expand the doctrine to allow vesting upon submission of a MUP. *Erickson*, 123 Wn.2d at 869, 873. The court disagreed with both of the developers' arguments and declined to extend the vested rights doctrine to a MUP. It held that Seattle's vesting ordinance "is constitutional and satisfies the requirements of case and statutory law." *Erickson*, 123 Wn.2d at 877. The court also stated that "[g]iven the substantial legislative activity in land use law, we are unwilling to modify or expand the vested rights doctrine unless it is required to protect the constitutional interests at stake." *Erickson*, 123 Wn.2d at 876. The court explained that

> our vesting doctrine is rooted in constitutional principles of fundamental fairness. The doctrine reflects a recognition that development rights represent a valuable and protectable property right. By promoting a date certain vesting point, our doctrine insures "that new land-use ordinances do not unduly oppress development rights, thereby denying a property owner's right to due process under the law." Our vested rights cases thus establish the constitutional minimum: a "date certain" standard that satisfies due process requirements.

*Erickson*, 123 Wn.2d at 870 (citations omitted) (quoting *Valley View Indus. Park v. Redmond*, 107 Wn.2d 621, 637, 733 P.2d 182 (1987). Therefore, we examine whether Bonney Lake's development process provides a date certain standard for vesting development rights.

¶26 Here, because Bonney Lake has not adopted a vesting ordinance, RCW 19.27.095(1) requires that vesting occur only when a building permit application is filed. And

Abbey Road argues that, under the Seattle vesting ordinance at issue in *Erickson*, a developer could file a building permit application at any time in the process and thereby control the vesting date, 123 Wn.2d at 871, while under Bonney Lake's scheme, a building permit application may be submitted only after the city has reviewed and approved a site development plan. The hearing examiner disagreed, concluding that

[t]he Type 3 process does not prohibit an applicant from filing a building permit application prior to completion of the process. To the contrary, the intent of the [BLMC] is to streamline and combine reviews for various permits and guide development in the City. The [BLMC] encourages concurrent review of building permit applications and Type 3 applications. [Abbey Road] could have filed a building permit application . . . and vested the project.

CP at 37-38. The hearing examiner's conclusion is consistent with BLMC 14.50.060 ("[n]o building permit shall be issued for work requiring a Type 3 permit until the 15-day appeal period has lapsed") and BLMC 14.90.020(D) ("If one permit cannot be reasonably processed until another is issued, such as a building permit[,] the 120 days within which a notice of decision must be issued for the contingent permit . . . shall not begin until the other permit has been issued.").

¶27 Abbey Road asserts that the hearing examiner's conclusion was in error because "it contradicts the testimony of the Building Official and [Bonney Lake's] own Commercial Building Permit Application form." Br. of Resp't at 28. Before the hearing examiner, Abbey Road elicited testimony that, in the past, Bonney Lake had required a particular developer to first obtain a "letter of completeness" on a site development plan review before submitting a building permit application. AR at 48. But, as was pointed out on cross-examination, the prior development project did not involve a dispute over vested rights. Here, the summary of the preapplication meeting reflected specific, albeit disputed, mention of a building permit.

Furthermore, contrary to Abbey Road's assertions, our review of the BLMC shows no requirement for a developer to obtain site development plan review approval before submitting a building permit application. Thus, consistent with *Erickson*, vesting occurs no later than the building permit application stage. 123 Wn.2d at 870. We hold that this establishes a sufficient date certain for rights to vest.

¶28 Abbey Road also asserts that it "had a right to rely on [Bonney Lake's] application form." Br. of Resp't at 39. The second page of the building permit application form has a check box to indicate that six copies of the "Approved Site Development Plans" are attached. AR Ex. 28. The hearing examiner found that by checking the "not applicable" box on the form, the building permit application would have been deemed complete for vesting purposes. CP at 35; *see* RCW 19.27.095(1) (requiring a "fully complete building permit application" for vesting). And it is undisputed that no BLMC ordinance specifically requires site development plan review approval before an applicant can submit the building permit application.

¶29 Abbey Road's argument is thus reduced to an assertion that it was reasonable for it to rely on its own erroneous interpretation of the building permit application form. Because Washington abandoned a detrimental reliance analysis for vesting development rights long ago, the hearing examiner's conclusion that Abbey Road's rights could not vest based on its misunderstanding of the form was not an erroneous application of the law.

¶30 Thus, we decline Abbey Road's invitation to expand the vested rights doctrine to a site development plan review application, absent a building permit application, because Bonney Lake's ordinances and processes satisfy statutory and constitutional concerns.

VI. BURDEN OF SITE DEVELOPMENT PLAN REVIEW DOES NOT CREATE VESTED RIGHTS

¶31 Finally, Abbey Road asserts that applying for site development plan review should vest its development

rights because "Bonney Lake's Type 3 site development permit application is onerous and expensive, and requires a substantial commitment from the developer." Br. of Resp't at 15. The developers made the same argument in *Erickson*. 123 Wn.2d at 873-74. Our Supreme Court rejected it, stating that "a cost-based analysis [would reintroduce] the case-by-case review of a developer's reliance interest we rejected 40 years ago when we adopted the vested rights doctrine." *Erickson*, 123 Wn.2d at 874.

¶32 Abbey Road also asserts that the hearing examiner "ignored the realities of large commercial or multi-family development" in finding that Bonney Lake's process does not impermissibly frustrate vesting. Br. of Resp't at 28. Abbey Road states:

> [I]t is not practical or feasible to submit complete building permit applications for large commercial or multi-family developments prior to Type 3 site development approval. Architectural design and engineering of building plans is expensive and time consuming. A relatively minor change in a site development plan such as setbacks, ingress-egress, or resizing of a storm water pond could have a domino effect on building plans, requiring buildings to be moved, resized or even eliminated.

Br. of Resp't at 33. This argument was also directly addressed and rejected in *Erickson:*

> Erickson lastly argues the practicalities of modern property development require us to extend the vested rights doctrine to Seattle's MUP process to maintain the balance of private and public interests embodied in the doctrine. Both parties agree land development in Washington has become an increasingly complex, discretionary, and expensive process. . . .
>
> Development interests and due process rights protected by the vested rights doctrine come at a cost to the public interest. The practical effect of recognizing a vested right is to sanction the creation of a new nonconforming use. A proposed development which does not conform to newly adopted laws is, by definition, inimical to the public interest embodied in those laws. If a vested right is too easily granted, the public interest is subverted.

This court recognized the tension between public and private interests when it adopted Washington's vested rights doctrine. The court balanced the private property and due process rights against the public interest by selecting a vesting point which prevents "permit speculation", and which demonstrates substantial commitment by the developer, such that the good faith of the applicant is generally assured. The application for a building permit demonstrates the requisite level of commitment.

*Erickson,* 123 Wn.2d at 873-74. Thus, Abbey Road's argument does not persuade us to abandon Washington's bright-line rule for vesting development rights.[10]

¶33 We hold that no development rights vested when Abbey Road filed an application for site development plan review. Furthermore, we hold that Bonney Lake's development scheme is not so burdensome that it unconstitutionally frustrates vesting rights under ordinances and building codes in effect when a building permit is filed, nor does it conflict with statutory or case law controlling vesting of development rights. Accordingly, we are not persuaded that the hearing examiner erroneously interpreted or applied the law or that the hearing examiner's decision is clearly erroneous or constitutionally flawed.

¶34 We reverse the trial court's decision that Abbey Road has a right to develop the 575-unit condominium project within Bonney Lake city limits based on its filing for site development plan review, and we remand for further proceedings consistent with this opinion.

ARMSTRONG and PENOYAR, JJ., concur.

Review granted at 163 Wn.2d 1045 (2008).

---

[10] Abbey Road also, without citation to authority, argues that Bonney Lake's vesting process violates RCW 64.34.050. RCW 64.34.050(1) states in relevant part that a "zoning, subdivision, building code, or other real property law, ordinance, or regulation may not . . . impose any requirement upon a condominium which it would not impose upon a physically identical development under a different form of ownership." Abbey Road reasons that a site development plan review application for condominiums should vest because a preliminary plat application for apartments would vest and disparate treatment violates the statute. But, since it is state law and not a Bonney Lake "zoning, subdivision, building code, or other real property law, ordinance, or regulation" that controls vesting here, this argument is without merit.